**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

NORTHERN DISTRICT OF ILLINOIS

Case number *(if known)* _____  Chapter __7__

☐ Check if this is an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **SandP Solutions LLC, dba Bitcoin of America** |
| 2. | **All other names debtor used in the last 8 years** Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **47-4520650** |

| | | | |
|---|---|---|---|
| 4. | **Debtor's address** | **Principal place of business** | **Mailing address, if different from principal place of business** |
| | | **1904 Ogden Ave** **Lisle, IL 60532** Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| | | **DuPage** County | **Location of principal assets, if different from principal place of business** |
| | | | Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐ Partnership (excluding LLP) |
| | | ☐ Other. Specify: _____ |

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | _____ |
|---|---|---|---|
| | Name | | |

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

_____

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

■ Chapter 7

☐ Chapter 9

☐ Chapter 11. *Check **all** that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.
☐ Yes.

| District | _____ | When | _____ | Case number | _____ |
|---|---|---|---|---|---|
| District | _____ | When | _____ | Case number | _____ |

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No
☐ Yes.

Debtor    **SandP Solutions LLC, dba Bitcoin of America**                Case number (*if known*) _____
          Name

| List all cases. If more than 1, attach a separate list | Debtor _____ | | Relationship _____ |
|---|---|---|---|
| | District _____ | When _____ | Case number, if known _____ |

---

**11. Why is the case filed in *this district*?**   *Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes.  Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
   What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
                          Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.  Insurance agency _____
         Contact name _____
         Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**   *Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

---

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ■ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

---

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| NORTHERN DISTRICT OF ILLINOIS |
| Case number *(if known)* _____   Chapter   **7** |

☐ Check if this is an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy                    04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | Request for Relief, Declaration, and Signatures |
| --- | --- |

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **August 5, 2025**
MM / DD / YYYY

X **/s/ Sonny Meraban**                                   **Sonny Meraban**
Signature of authorized representative of debtor         Printed name

Title   **Manager**

**18. Signature of attorney**

X **/s/ Steve Jakubowski**                    Date **August 5, 2025**
Signature of attorney for debtor                  MM / DD / YYYY

**Steve Jakubowski (ARDC #6191960)**
Printed name

**Buchalter, A Professional Corp**
Firm name

**180 North LaSalle Street
Suite 3300
Chicago, IL 60601-2808**
Number, Street, City, State & ZIP Code

Contact phone   **312-980-5760**      Email address   **sjakubowski@buchalter.com**

**6191960 IL**
Bar number and State

Fill in this information to identify the case:

Debtor name    **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF ILLINOIS

Case number (if known)

☐ Check if this is an
amended filing

## Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| | Declaration and signature |
|---|---|

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

■  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

■  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

■  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

■  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

■  *Schedule H: Codebtors* (Official Form 206H)

■  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  Amended *Schedule*

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐  Other document that requires a declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 5, 2025**    X **/s/ Sonny Meraban**

Signature of individual signing on behalf of debtor

**Sonny Meraban**
Printed name

**Manager**
Position or relationship to debtor

Official Form 202    **Declaration Under Penalty of Perjury for Non-Individual Debtors**

| Fill in this information to identify the case: |
|---|

Debtor name    **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF ILLINOIS

Case number (if known)    _____

☐ Check if this is an
    amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals     12/15

| Part 1: | Summary of Assets |
|---|---|

1. ***Schedule A/B: Assets-Real and Personal Property*** (Official Form 206A/B)

   **1a. Real property:**
   Copy line 88 from *Schedule A/B*...........................................................................    $        **0.00**

   **1b. Total personal property:**
   Copy line 91A from *Schedule A/B*.........................................................................    $        **18,185,584.25**

   **1c. Total of all property:**
   Copy line 92 from *Schedule A/B*...........................................................................    $        **18,185,584.25**

| Part 2: | Summary of Liabilities |
|---|---|

2. ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*....................    $        **191,925.00**

3. ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F)

   **3a. Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*............................................................    $        **0.00**

   **3b. Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*...............................    +$        **21,999,778.75**

4. **Total liabilities** ................................................................................................
   Lines 2 + 3a + 3b     $        **22,191,703.75**

**Fill in this information to identify the case:**

Debtor name **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF ILLINOIS

Case number (if known) _____

☐ Check if this is an
   amended filing

# Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property       12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
| --- | --- |

1. **Does the debtor have any cash or cash equivalents?**

   ☒ No. Go to Part 2.
   ☐ Yes Fill in the information below.

   **All cash or cash equivalents owned or controlled by the debtor**       Current value of debtor's interest

| Part 2: | Deposits and Prepayments |
| --- | --- |

6. **Does the debtor have any deposits or prepayments?**

   ☒ No. Go to Part 3.
   ☐ Yes Fill in the information below.

| Part 3: | Accounts receivable |
| --- | --- |

10. **Does the debtor have any accounts receivable?**

    ☐ No. Go to Part 4.
    ☒ Yes Fill in the information below.

11. **Accounts receivable**
    Invoice No. 100 dated May 19, 2023 for payments on (3) van leases and (1) truck lease owed by Taproot Acquisition Enterprises, LLC

    | 11b. Over 90 days old: | 8,400.00 | - | 4,200.00 | =... | $4,200.00 |
    | --- | --- | --- | --- | --- | --- |
    | | face amount | | doubtful or uncollectible accounts | | |

    Invoice No. 101 dated June 17, 2023 for payments on (3) van leases plus toll fees owed by Taproot Acquisition Enterprises, LLC

    | 11b. Over 90 days old: | 4,846.50 | - | 2,423.25 | =... | $2,423.25 |
    | --- | --- | --- | --- | --- | --- |
    | | face amount | | doubtful or uncollectible accounts | | |

    Insurance deductible reimbursement owed by Taproot Acquisition Enterprises, LLC for repairs done on leased van

    | 11b. Over 90 days old: | 2,000.00 | - | 1,000.00 | =... | $1,000.00 |
    | --- | --- | --- | --- | --- | --- |
    | | face amount | | doubtful or uncollectible accounts | | |

12. **Total of Part 3.**                                                                    $7,623.25
    Current value on lines 11a + 11b = line 12.  Copy the total to line 82.

Debtor    **SandP Solutions LLC, dba Bitcoin of America**                    Case number *(If known)* _____
                   Name

| Part 4: | Investments |
|---|---|

**13. Does the debtor own any investments?**

■ No.  Go to Part 5.
☐ Yes Fill in the information below.

| Part 5: | Inventory, excluding agriculture assets |
|---|---|

**18. Does the debtor own any inventory (excluding agriculture assets)?**

■ No.  Go to Part 6.
☐ Yes Fill in the information below.

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |
|---|---|

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No.  Go to Part 7.
☐ Yes Fill in the information below.

| Part 7: | Office furniture, fixtures, and equipment; and collectibles |
|---|---|

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

■ No.  Go to Part 8.
☐ Yes Fill in the information below.

| Part 8: | Machinery, equipment, and vehicles |
|---|---|

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No.  Go to Part 9.
■ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 48. **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors,<br>floating homes, personal watercraft, and fishing vessels | | | |
| 49. **Aircraft and accessories** | | | |
| 50. **Other machinery, fixtures, and equipment (excluding farm<br>machinery and equipment)**<br>**Genmega UK1 Bitcoin ATMs (1246 count)** | Unknown | | Unknown |
| **Genmega UK2 Bitcoin ATMs (410 count)** | Unknown | | Unknown |
| **Bitcoin ATMs (36 count) financed by CIT<br>Group, Inc. pursuant to Master EFA Agreement<br>#ME01898925.** | Unknown | | Unknown |
| **Genmega UK2 Bitcoin ATMs (200 count)** | Unknown | | Unknown |

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 2

Debtor   **SandP Solutions LLC, dba Bitcoin of America**                          Case number *(If known)* _____
Name

**51.**   **Total of Part 8.**

| | $0.00 |

Add lines 47 through 50.  Copy the total to line 87.

**52.**   **Is a depreciation schedule available for any of the property listed in Part 8?**
■ No
☐ Yes

**53.**   **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
☒ No
☐ Yes

## Part 9:   Real property

**54. Does the debtor own or lease any real property?**

☒ No.  Go to Part 10.
☐ Yes Fill in the information below.

## Part 10:   Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☒ No.  Go to Part 11.
☐ Yes Fill in the information below.

## Part 11:   All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No.  Go to Part 12.
☒ Yes Fill in the information below.

|  | Current value of debtor's interest |
|---|---|

**71.**   **Notes receivable**
Description (include name of obligor)
**December 11, 2020 Promissory Note in the original principal amount of $300,000 with Sonny Meraban and Alice Gorodetsky as borrowers. Subject to setoff.**

| 176,558.18 | - | 176,558.18 | = | |
|---|---|---|---|---|
| Total face amount | | doubtful or uncollectible amount | | |
| | | | | $0.00 |

**72.**   **Tax refunds and unused net operating losses (NOLs)**
Description (for example, federal, state, local)

**73.**   **Interests in insurance policies or annuities**

**74.**   **Causes of action against third parties (whether or not a lawsuit has been filed)**

**75.**   **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**
**75.1 Claim against Taproot Acquisition Enterprises, LLC; Jordan Mirch; Jorge Fernandez; ATM Ops Inc. d/b/a Bitstop; and Powercoin, LLC**

| | Unknown |

Nature of claim      **See attached**
Amount requested

Debtor    __SandP Solutions LLC, dba Bitcoin of America__          Case number *(If known)* _____
      Name

**75.2 Claim against Athena Bitcoin, Inc., a Delaware corporation, as subsequent transferee, for return of Bitcoin ATMs, having taken the Bitcoin ATMs with knowledge, on information and belief, that seller did not have proper title to the Bitcoin ATMs**

**Unknown**

Nature of claim          _____
Amount requested       _____

---

**75.3 Claim against a Texas corporation, as subsequent transferee, name of entity subject to protective order, for return of Bitcoin ATMs, having taken the Bitcoin ATMs with knowledge, on information and belief, that seller did not have proper title to the Bitcoin ATMs**

**Unknown**

Nature of claim          _____
Amount requested       _____

---

**75.4 Claim against an Alabama corporation, as subsequent transferee, name of entity subject to protective order, for return of Bitcoin ATMs, having taken the Bitcoin ATMs with knowledge, on information and belief, that seller did not have proper title to the Bitcoin ATMs**

**Unknown**

Nature of claim          _____
Amount requested       _____

---

**75.5 Claim against a Florida corporation, as subsequent transferee, name of entity subject to protective order, for return of Bitcoin ATMs, having taken the Bitcoin ATMs with knowledge, on information and belief, that seller did not have proper title to the Bitcoin ATMs**

**Unknown**

Nature of claim          _____
Amount requested       _____

---

**75.6 Claim against The Gordon Law Group, Ltd. and Adducci Vega Financial Group, PLLC**

**Unknown**

Nature of claim          **Professional malpractice**
Amount requested       _____

---

**75.7 Potential proceeds from potential settlement in the matter of Sonny Meraban, SandP Solutions, LLC, AML Software, Inc. v. The Gordon Law Group, Ltd., and Adducci Vega Financial Group PLLC, currently pending in Circuit Court of Cook County, Case No. 2024-L-00516**

**Unknown**

Nature of claim          **Professional malpractice**
Amount requested       _____

---

**75.8 Claim against Taproot Acquisition Enterprises, LLC for payments due under (i) April 1, 2023 Equipment Lease Agreement between SandP Solutions, LLC , as Lessor, and Taproot Acquisition Enterprises, LLC, as Lessee ; and (ii) April 7, 2023 Equipment Lease Agreement between SandP Solutions, LLC, as Lessor, and Taproot Acquisition Enterprises, LLC, as Lessee**

**$15,962,074.00**

Nature of claim          **See attached**
Amount requested       _____

---

| Debtor | **SandP Solutions LLC, dba Bitcoin of America** | Case number *(If known)* | |
|--------|------------------------------------------------|--------------------------|---|
| | Name | | |

| | | |
|---|---|---|
| | **75.9 Claim against Taproot Acquisition Enterprises, LLC for cash in Bitcoin ATM Bill Acceptors that it failed to return to Debtor** | **$2,215,887.00** |
| | Nature of claim     See attached | |
| | Amount requested | |

---

76.    **Trusts, equitable or future interests in property**

77.    **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

78.    **Total of Part 11.**

      Add lines 71 through 77. Copy the total to line 90.

| |
|---|
| **$18,177,961.00** |

79.    **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

■ No

☐ Yes

## <u>SUPPLEMENT TO SCHEDULE A/B:</u>
## <u>ASSETS – REAL AND PERSONAL PROPERTY</u>

**75.1** Claim against Taproot Acquisition Enterprises, LLC; Jordan Mirch; Jorge Fernandez; ATM Ops Inc. d/b/a Bitstop; and Powercoin, LLC

    *See Fourth Amended Complaint*, attached, filed in the matter of SANDP Solutions, LLC v. Jordan Mirch; Taproot Acquisition Enterprises, LLC; Jorge Fernandez; ATM Ops, Inc. d/b/a Bitstop; Powercoin, LLC, currently pending in the Circuit Court of Cook County, Illinois, Case No. 2023 CH 06098.

FILED
4/29/2025 9:11 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2023CH06098
Calendar, 3
32478757

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

SANDP SOLUTIONS, LLC

    Plaintiff,

v.

JORDAN MIRCH;
TAPROOT ACQUISITION ENTERPRISES,
LLC; JORGE FERNANDEZ; ATM OPS
INC. D/B/A BITSTOP; POWERCOIN, LLC,

    Defendants.

Case No.: 2023 CH 06098

Jury Demanded

## FOURTH AMENDED COMPLAINT

Plaintiff SandP Solutions, LLC ("S&P"), by and through its attorneys, ANGELINI &

DILEO, P.C., files this Fourth Amended Complaint and jury demand against Defendants Jordan

Mirch ("Mirch"), Taproot Acquisition Enterprises, LLC ("Taproot"), Jorge Fernandez

("Fernandez"), ATM Ops Inc. d/b/a Bitstop ("Bitstop") and PowerCoin, LLC ("Powercoin")

(Bitstop and PowerCoin collectively, "Operator Defendants").

## PARTIES & VENUE

1.    Plaintiff S&P is an Illinois limited liability company doing business as Bitcoin of

America, with its principal place of business in Lisle, Illinois. S&P has operated Bitcoin ATMs

("BTMs") across the country since April of 2015.

2.    Defendant Jordan Mirch is an individual that, on information and belief, resides in

Miami Beach, Florida. On information and belief, Mirch has an ownership interest in, operates and

controls, and/or is an officer of Taproot, both of which conduct business in Illinois. On

1

information and belief, at all relevant times, Mirch was affiliated with and acted as a representative of Defendants *Taproot*, *Powercoin* and *Bitstop.*

3.    On information and belief, Defendant *Taproot* is a Delaware limited liability company conducting business in Illinois. On information and belief, at all relevant times, *Taproot* was the alter ego of Defendants Mirch and Fernandez and was used merely as an instrumentality to conduct these defendants' unlawful and fraudulent acts.

4.    Defendant Jorge Fernandez is an individual that, on information and belief, resides in Miami, Florida.  On information and belief, at all relevant times, Fernandez was affiliated with and acted as a representative of Defendants *Taproot, Powercoin and Bitstop.*

5.    On information and belief, Defendant ATM Ops Inc. d/b/a Bitstop ("Bitstop") is a Delaware corporation with its principal place of business in Miami, Florida, and which is conducting business in Illinois.

6.    On information and belief, similar to *S&P, Bitstop* operates BTMs in various locations around the company. On information and belief, Defendant Fernandez is a principal of *Bitstop.*

7.    On information and belief, Defendant *Powercoin,* LLC ("Powercoin") is a Pennsylvania limited liability company with its principal place of business in Lancaster, PA, and is conducting business in Illinois. On information and belief, Defendant Fernandez is a principal of *Powercoin.*

8.    Venue for this action lies in Cook County, Illinois, pursuant to section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that this action arises out of transactions and activities that occurred in part in Cook County.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

9.      BTMs are used to conduct various cryptocurrency transactions.  BTM operators like S&P often retain a percentage of the transaction amounts processed on their BTMs.

10.     As of March of 2023, S&P had over 2,700 BTMs located in various locations, including without limitation gas stations, convenience stores, and other retail locations ("BTM Locations"). It also had certain BTMs that were in storage and not deployed at BTM locations.

11.     Some of S&P's BTMs were owned outright by S&P, while others were financed and/or leased.

12.     S&P contracts with the owners of the BTM Locations for the placement of its ATMs ("Location Leases"). Each of these Location Leases provides for unilateral termination by S&P under certain conditions, including that a BTM Location has not generated the requisite transactional amounts in any of the first six months of the Location Lease term.

13.     S&P's BTM Locations and Location Leases were a critical part of its business that took years and millions of dollars to establish.

14.     One of S&P's competitors in the BTM market was Fernandez. On information and belief, Fernandez helped to found and run three BTM companies with a business model very similar to S&P's. The companies founded by Fernandez include Defendants *Bitstop* and *Powercoin* (collectively, the "Operator Defendants") all of which are in the business of deploying and/or operating BTMs in the U.S. and abroad.

15.     On information and belief, the Operator Defendants are under common ownership or control, and Defendant Fernandez is a principal of each of them.

16.     On numerous occasions, Fernandez approached the owners of S&P and expressed a desire to purchase the business. Fernandez, through a hedge fund he was associated with, first approached S&P about a potential transaction in the fall of 2020. In late 2022 and early

3

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

2023, Fernandez again approached S&P to discuss a potential buy-out. A sales price in the tens of millions of dollars was discussed; however, no sale was consummated, and negotiations ceased.

17.     In early March of 2023, S&P and several of its principles were investigated and criminally charged with operating certain BTMs in Northwest-Ohio without the requisite licensure, among other alleged violations.

18.     Although the vast majority of the transactions that occurred at these Ohio BTMs were legitimate, and investigators did not contend that S&P was involved in any scam transactions, unrelated third-parties allegedly utilized S&P's BTMs in furtherance of various fraudulent schemes. As a result of the charges against it, S&P was prohibited from continuing to operate its inventory of BTMs in Ohio and was left without the resources to continue operations nationwide.

19.     This left S&P in a vulnerable position, since it had existing financial obligations relating to (1) various third-parties that had financed and/or leased certain of S&P's BTMs and (2) the Location Leases.  In that vein, Defendants, Jordan Mirch, Jorge Fernandez and the businesses that they were associated with, including *Bitstop* and *PowerCoin*, and saw an opening to exploit S&P.  S&P was in this perilous position when the company was approached by Defendants Mirch and Fernandez.

20.     Knowing that S&P in a perilous position, Mirch and Fernadez concocted a scheme to literally assume all of the assets of S&P for zero consideration.   In this scheme, Mirch and Fernandez would sell S&P on the concept of allowing Mirch and Fernandez through their Defendant Operators to assume control over all of S&P's assets in consideration for guaranteed monthly payments to S&P through its operating entities.   In reality, Mirch and Fernandez never intended on contracting with S&P through its operating entities, as those companies had had value and were subject to liability in the event of breach.   Instead, Mirch and Fernandez sold S&P on the concept that a "strawman" entity had to be created to hide the Operator Defendants from the

4

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

scrutiny of going into business with a company (S&P) that was under federal indictment.

21.    By utilizing a "strawman" (Taproot) Mirch and Fernandez could complete its scheme by having an entity with zero assets or liabilities, engage in a contractual relationship with S&P in order to (a) prevent S&P from identifying where its machines had been placed, (b) to whom the machines had been leased and (c  the amounts of money that were owed to S&P pursuant to the agreement.  In other words, Mirch and Fernandez basically created an entity to carry out an intricate scheme to assume all of the assets of an entity under investigation, for zero consideration.

22.    In furtherance of the scheme, S&P received an unsolicited communication from Mirch on March 2, 2023, shortly after the news broke of the Ohio charges. Mirch insisted that he and "his companies" could operate S&P's BTMs right away and save the S&P business. Remarkably, Mirch told S&P that he had already taken it upon himself to take over and migrate two of their BTMs without S&P's consent.

23.    The same day, Fernandez began communicating over text message with the wife of the principal owner of S&P, offering a proposal and promising "the business can be rescued if we act quickly and think creatively." Fernandez said that S&P's competitors were using S&P's arrest to attempt to "chop you apart," and that he was offering a lifeline. Fernandez promised, "this too shall pass, and we can help you. Let's rescue what we can quickly."

24.    In making these statements, Mirch and Fernandez were acting together and on behalf of the Operator Defendants, including Bitstop and Powercoin, each of whom wanted to gain use of or otherwise profit off S&P's vast network of BTMs.

25.    Over the following days, Mirch and Fernandez continued to insist that they and the Operator Defendants provided the only path to safety for S&P, and that they would provide a bridge for S&P. Moreover, Fernandez threatened that if S&P did not agree to a deal quickly, unnamed "mercenaries" would take S&P's accounts and destroy its business. He wrote, "every

5

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

day that goes by is another day you allow your competitors to chop away at your business. As an example, I received a call this morning from some mercenaries in the market that are putting together a sales team to go after your accounts." The implication of these and similar electronic communications was clear: partner with Mirch, Fernandez and the Operator Defendants or face the total loss of the business.

26.    Mirch, Fernandez and the other Operator Defendants were also aware of S&P's existing financial obligations, including the fact that a percentage of its BTM fleet was financed through arrangements with third party lenders, including *AvTech Capital*. Mirch and Fernandez promised that they and the Operator Defendants, including *Powercoin and Bitstop*,  could provide S&P with necessary cash flow to satisfy these and other obligations during its period of operational uncertainty.  Instead, in the intricate "shell game," instead of the Operator Defendants contracting directly with S&P, *Taproot* was created to essentially isolate the Operator Defendants from liability.

27.    And the Operator Defendants were in on it from the beginning.   The Operator Defendants knew before *Taproot* ever contracted with S&P, that they were going to be the beneficiaries of Mirch, Fernandez and *Taproot*'s fraud, as they would be given the opportunity to lease the BTMs without ever having to honor a single obligation to S&P.

28.    It was nearly a perfect scheme.   Mirch, Fernandez and *Taproot* knew that S&P had dozens of options to negotiate directly a sale of its business to any number of BTM Operators. Through material misrepresentations of fact. Mirch, Ferandez and Taproot, were able to convince that this "strawman" method would be the most effective way to manage the S&P BTMs.    In reality, the creation of Taproot was merely a way for Mirch and Fernandez to assume the operation and control of a highly profitable S&P.

29.    Indeed, Mirch and Fernandez told S&P that they and the Operator Defendants could quickly take over S&P's operations, work with S&P to terminate its existing Location Leases, and

6

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

enter into new lease agreements with the owners of the BTM Locations.

30.     Essentially, the idea was that S&P would introduce Mirch and Fernandez to its BTM Locations as representatives of other BTM Operators that could take over and provide a seamless way to replace the lost lease income following S&P's cessation of operations. In exchange for use of S&P's inventory of thousands of BTMs worth nearly $20,000,000, S&P would receive certain timely payments so it would be able to meet existing financial obligations to its creditors, including to *AvTech Capital.*

31.     But despite painting themselves as the "saviors" of S&P, Mirch and Fernandez, and the Operator Defendants that they represented were merely misleading S&P. Indeed, their ultimate goal was to fraudulently induce S&P to enter into a deal that they would profit extensively from without having to fairly compensate S&P.

32.     Indeed, Mirch's and Fernandez's false statements during the negotiations between the parties, including that Mirch, Fernandez and the Operator Defendants would provide necessary cashflow so S&P could satisfy its ongoing debt obligations, were part of a larger scheme to defraud S&P. Mirch, Fernandez, and the Operator Defendants planned to take possession and control of S&P's income generating assets, including without limitation its BTMs and the BTM Locations, and then starve S&P. Mirch, Fernandez, and the Operator Defendants knew that, without dominion over these assets, S&P would be unable to generate income from these assets and it would put the company in a more perilous position. This was the goal of Mirch, Fernandez, *Bitstop* and *Powercoin* all along; to render S&P more vulnerable to the Defendants' own subsequent attacks.

33.     Despite their sinister intentions, all throughout the negotiations, Defendants Mirch and Fernandez continued to present themselves and the Operator Defendants as saviors for S&P. For instance, in one text Fernandez sent in late March 2023 he told S&P's owner: "You built a

7

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

great company. We don't want to see it go by the wayside. Thanks for the trust. We will do a great job for you."

34.     The negotiations between the parties, which primarily occurred in March and April 2023, were conducted by Mirch, Fernandez, and their counsel, Jordan Finfer. Based on Mirch and Fernandez's representations to S&P, and Fernandez's known affiliation with the Operator Defendants, S&P understood at first that it was negotiating with Mirch and Fernandez as representatives of the Operator Defendants, *Bitstop* and *Powercoin*.

35.     It was only later that Mirch and Fernandez insisted that a single purpose company, *Taproot*, would be created to carry out the takeover of S&P's BTMs and be a party to the contract with S&P.

36.     Fernandez claimed that the Operator Defendants, *Bitstop* and *Powercoin* could not be signatories to the ultimate agreement with S&P in light of the charges facing S&P, and that *Taproot* was a necessary buffer for the Operator Defendants. Nonetheless, Fernandez indicated to S&P that he and the Operator Defendants would remain involved behind the scenes. S&P would not have continued through with the transaction absent Fernandez's representation to this effect.

37.     Had S&P not reached an agreement with the Defendants, Mirch, Fernandez and Taproot,, it could have alternatively leased its BTMs (and shared their corresponding BTM Locations) with other BTM operators in the space, including without limitation *Cryptobase* and *Athena Global*. Indeed, these same operators ultimately ended up subleasing some of S&P's BTMs from Taproot.

38.     On information and belief, Mirch, Fernandez, and the Operator Defendants used Taproot as an instrumentality for their related business interests and as part of their greater scheme to defraud S&P. While Taproot was the ultimate contracting party, on information and belief, Mirch, Fernandez and the Operator Defendants knew that many of the profits and other benefits

8

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

derived from S&P's BTMs would flow directly to Mirch, Fernandez, the Operator Defendants, and other affiliates of these parties. Further, on information and belief, at all relevant times, Mirch, Fernandez, and the Operator Defendants intended to use Taproot as a liability shield for their fraudulent activity.

39.     It has now become clear that Mirch, Fernandez, the Operator Defendants, and the entity set up to shield their liability (Taproot) did not enter into a business relationship with S&P in good faith. Instead, these Defendants induced S&P to enter into certain agreements knowing Taproot would never perform under those agreements and did so as part of a larger scheme to gain access to S&P's BTM fleet and valuable information S&P possessed regarding the BTM Locations and the terms of the Location Leases without paying fair compensation. More specifically, at all relevant times, these Defendants sought to further imperil S&P through Taproot's failure to pay rightful amounts owed to S&P, as these Defendants knew such action would put S&P in a compromised position with its creditors. As described more fully below, these Defendants end goal was to put S&P in an inescapably leveraged position and essentially hold any payments hostage until S&P favorably renegotiated the terms of the parties' agreement or the Defendants could otherwise exploit S&P's compromised position.

40.     The scheme began in March, when Mirch and Fernandez made repeated false promises about effectively rescuing S&P in its time of need. In early April 2023, as a result of those false promises, S&P, on one hand, and Taproot, on the other, entered into certain lease agreements for the use of S&P's BTMs ("BTM Leases"). *See* Exhibits 1 & 2. At Mirch's repeated urging, S&P also agreed to provide valuable information regarding the identities and terms of its Location Leases.

9

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

41.     The BTM Leases provided that, in exchange for use of S&P's BTMs, Taproot would pay S&P specified monthly rent. Additionally, to the extent Taproot was able to secure a new lease with an existing BTM Location owner, S&P would be entitled to a "success fee." Finally, the leases provided that S&P and Taproot "shall work together to terminate all of [S&P's existing Location Leases]."

42.     Mirch thereafter indicated to S&P that Taproot would not be seeking to convert any of S&P's BTMs located in Ohio, but that it would take over and migrate S&P's remaining BTMs at the BTM Locations across the country.

43.     Additionally, Mirch indicated that Taproot was willing to take possession of certain BTMs that S&P had in storage ("Storage BTMs") for immediate deployment. With respect to both the BTM Locations' BTMs and the Storage BTMs, it was understood and agreed to by the parties that Taproot would take immediate steps to take over and migrate these machines for its own benefit and would begin paying S&P rent.

44.     S&P further agreed to provide, and Taproot agreed to separately pay, for other necessary equipment to operate and/or service the BTMs, but which were not part of the BTMs themselves. Specifically, Taproot agreed to separately purchase wireless adapters and protective sleeves that were installed on certain of the BTMs. Taproot also agreed that as part of Taproot's conversion of S&P's BTMs, it would collect and remit certain "hard drives" installed in the BTMs to S&P, as Taproot would be installing its own hard drives into many of the machines.

45.     Finally, Mirch agreed that Taproot would provide updates of Taproot's conversion activities so the parties could track payments owed and also agreed that to the extent a BTM was damaged or otherwise not in working order, Taproot would notify S&P of these problems so they could be promptly resolved.

10

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

46.     The next stage of the fraudulent scheme perpetrated by Mirch, Fernandez, and the Operator Defendants through Taproot was to convert as many of S&P's BTMs as they could while keeping S&P in the dark as to their activities.

47.     Pursuant to the terms of the BTM Leases that the parties "work together" to terminate the existing BTM Leases, Mirch and Fernandez asked S&P to send the BTM Location owners a communication drafted by Fernandez introducing the BTM Locations to Mirch.

48.     After these initial introductions, however, Mirch and Fernandez instructed S&P that the best way for the parties to cooperate in terminating the existing BTM Leases and otherwise converting the locations was for S&P to refrain from contacting any of the BTM Locations further. Through various communications, including electronic communications, Mirch and Fernandez falsely told S&P that it would be more effective if there was one point of contact for terminating the existing Location Leases and signing the BTM Locations up for new leases with Taproot. On information and belief, Mirch's and Fernandez's true aim in making this request was to keep S&P in the dark as to how many BTM Locations had been converted and when, and then to later falsely claim that S&P had not satisfied its obligation to "work together" with Taproot to terminate these the existing leases with the BTM Locations.

49.     S&P agreed to cooperate with Taproot and allow Taproot to be the sole contact with the BTM Locations for this purpose based on Mirch's and Fernandez's representations that they would take steps to effectuate the termination of the existing Location Leases when they entered into new leases with the BTM Locations and would soon start paying S&P under the terms of the BTM Leases.

50.     Mirch, Fernandez, and the Operator Defendants, through Taproot, thereafter utilized the valuable information provided by S&P relating to the Location Leases, as well as other

11

S&P resources (including without limitation its vehicles, wireless adapters, and protective sleeves), to take over and migrate a vast majority of S&P's BTMs.

51.    Along with Mirch, and other third-party contractors, Fernandez and the Operator Defendants were actively part of this process. For instance, Fernandez, on behalf of certain of the Operator Defendants, entered into lease agreements directly with the BTM Locations. On information and belief, there were no subleases or other written contracts governing the terms under which the Operator Defendants acquired Taproot's rights to use these BTMs or the BTM Locations.

52.    On information and belief, certain of the Operator Defendants, including *Bitstop* and *Powercoin*, took over and began operating S&P's BTMs at certain locations. On information and belief, there were no subleases or other written contracts governing the terms under which the *Bitstop* and *Powercoin* acquired Taproot's rights to use these BTMs or the BTM Locations. On information and belief, *Bitstop* and *Powercoin* did not pay Taproot for use of these BTMs.

53.    Mirch, Fernandez, Taproot, and/or the Operator Defendants also engaged other third parties (the "Conversion Contractors") to reach out to the BTM Locations to get them to sign up with Taproot or its affiliates, including the Operator Defendants. On information and belief, Mirch used electronic communications to fraudulently promise certain compensation to the Conversion Contractors for getting the BTM Locations to sign new lease agreements, fully knowing that he never intended on paying them. On information and belief, Mirch shielded himself and the other Defendants from any blowback by utilizing various LLCs that he had previously founded (but were now defunct) to enter into the arrangements with the Conversion Contractors. On information and belief, after these Conversion Contractors had secured new leases with the BTM Locations, Mirch refused to pay them.

12

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

54.     Because S&P was in the dark and Mirch refused to provide any reliable or up to date information regarding the conversion activities, S&P was unaware of what Mirch, Fernandez, and the other Defendants were doing. Additionally, S&P was unaware that Taproot did not fulfill Mirch's and Fernandez's fraudulent promises that Taproot would take steps to terminate the existing leases at the BTM locations.

55.     Additionally, S&P later learned that Mirch had personally, and instructed others, including the Conversion Contractors, to falsely promise the BTM Locations that, *if they signed a new agreement with Taproot or its assign*, the BTM Location would be paid back rent owed by S&P. This was never part of the agreement with S&P and Mirch and others that made this promise on his instruction did not have authority from S&P to make these false promises.

56.     On information and belief, these false statements made by Mirch and others at his request – some of which were conveyed by way of electronic communications, were also part of the bigger scheme perpetrated by Mirch, Fernandez and the Operator Defendants through Taproot. First, on information and belief, these false promises aided in the ease of conversion of the BTMs, because by making this false promise to pay any back rent that had accrued since S&P ceased operations, it aided these Defendants' efforts to secure new agreements with the BTM Locations for their own use.

57.     Second, on information and belief, Mirch planned to use these false promises as a means to fraudulently offset the amounts ultimately owed to S&P. More specifically, on information and belief, Mirch never planned for Taproot (or any other entity) to pay the BTM Locations back rent and for the vast majority of locations has not done so.  Nonetheless, when it came time to settle what was owed to S&P, Mirch insisted that any back rent previously owed by

13

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

S&P would have to be deducted from amounts owed by Taproot. In other words, Taproot demanded credit for these amounts even though it never planned on actually paying these costs.

58.     Mirch's conduct in making these false promises (or instructing others to make these false promises) was without regard to the damage it may cause S&P, including S&P's ability to pay or negotiate with the BTM Locations. Indeed, S&P explicitly told Mirch that it did not need to obtain a release from the BTM Locations as to back rent owed and made clear that if the BTM Locations wanted to pursue back rent claims against S&P it would address them on a case by case basis.

59.     Third, on information and belief, Mirch also injected the back rent issue because he believed it would delay the termination of the existing BTM Location leases and that absent termination of those leases, Taproot would not have to pay any rent to S&P for use of their BTMs. As noted however, even in the event of back rent owed, S&P had a unilateral right to terminate the existing BTM leases. Had S&P known that Taproot was ignoring its promise to terminate these leases, it would have taken steps to promptly terminate those leases on their own, cutting off any argument that (1) rent and success fees were not owed under the agreements with Taproot and (2) that back rent was continuing to accrue under the existing leases.

60.     S&P has also since learned that at certain locations, not only has Taproot failed to terminate the existing Location Leases after taking over BTMs, Taproot has also failed to pay the BTM Location's rent after converting the BTMs and/or BTM Locations for its own use. In other words, Taproot, despite (directly or indirectly) entering into new lease agreements and deriving a benefit from these BTMs and BTM Locations, have failed to pay rent owed to the BTM Locations. Not only does this pose the risk of additional potential liability to S&P under the existing Location Leases, it severely damages S&P's relationships with the BTM Locations.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

61.     Taproot's conduct in this regard has also endangered (and continues to endanger) S&P's inventory of BTMs, as many owners have contacted S&P and told them that they will remove or otherwise abandon the machines due to no ongoing rent payment being received. As a result, S&P notified Mirch and Taproot's counsel of these complaining BTM Locations and informed Mirch that it planned to start picking up these BTMs so that they are not abandoned or otherwise vandalized. Mirch and Taproot's response was to accuse S&P of interfering with its business and threatening that if S&P picked up any BTMs containing cash owned by Taproot or its assigns, it would pursue criminal charges against S&P. Accordingly, to date, S&P has only picked up BTMs where they appear to have not been converted or were otherwise abandoned by Taproot and its assigns.

62.     Despite taking over S&P's BTMs for Taproot's benefit and the benefit of the other Operator Defendants, and despite Mirch, Fernandez, the Operator Defendants, and others acting in concert with this scheme entering into hundreds (if not more) new leases with BTM Locations by utilizing the valuable information provided by S&P, Taproot has failed to make *any* payments under the BTM Leases or otherwise to S&P.

63.     Instead, Mirch and Taproot have offered a series of transparent and fraudulent excuses as to why rent has not been paid.  For instance, Mirch has repeatedly claimed that Taproot incurred significant expenses that needed to be addressed in any offsetting rent payment.  S&P demanded documentation of these expenses *and* that Defendants provide a basis for any expense that they claimed was owed by S&P. Neither has been sufficiently provided. Moreover, on information and belief, Mirch's statements – some of which were made through emails, texts and other electronic communications – were knowingly false, because on information and belief, Taproot had passed some of same expenses on to operators of the BTMs.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

64.     Similarly, without merit, Mirch falsely claimed that lease and success payments were not due because S&P has not paid "back rent" due to the BTM Locations under the existing leases. Yet, the settlement of back rent (if any is owed) was not covered by the agreement with Taproot and the lease payments due under that agreement are not conditioned on S&P paying back rent to the BTM Locations (to the extent any is owed). Further, Taproot has no liability under the Location Leases, and payment of back rent is not an expense that the parties ever discussed or agreed to. Rather, S&P has always maintained that back rent should be an issue between the BTM Locations and S&P, and explicitly told Mirch that Taproot did not need to secure a release of any of S&P's existing obligations to the BTM Locations.

65.     On information and belief, the efforts to withhold payments to S&P based on these false pretenses were all part of the greater fraudulent scheme perpetrated by Mirch, Fernandez, and the Operator Defendants through Taproot to render S&P in a financially vulnerable position and susceptible to further attacks by these defendants.

66.     Another piece of this greater scheme were the efforts by Mirch, Ferenandez, Taproot, and the Operator Defendants to take control of the vast amount of cash that was located in S&P's BTMs at the time the parties entered into the BTM Leases. According to verifiable records, tBTMs that Taproot sought to convert (everything except the BTMs in Ohio) should have cumulatively contained approximately $2,215,887. These amounts, which were unquestionably the property of S&P, represented critical operating funds necessary to continue to satisfy S&P's existing financing obligations.

67.     In order for Taproot to take over and migrate a BTM to a new operator, the existing cash (again, unquestionably payable to S&P) had to be removed from the BTMs to avoid co-

16

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

mingling with cash from the new operator. The BTM Leases contemplated that S&P would collect this cash prior to any rent being owed *unless* the parties mutually agreed to another arrangement.

68.     Shortly after the BTM Leases were executed, Mirch started to insist that *Taproot* and its affiliates, including the Operator Defendants to the extent they participated in the conversion of a particular BTM should pick up the cash. Mirch insisted that this was in both parties' best interest because Taproot and its representatives were already onsite to perform other conversion activities and could quickly recover the cash for S&P. Although S&P initially resisted, Mirch was adamant that Taproot and its representatives be permitted to pick up the cash and that it was beneficial for Taproot because they could immediately migrate the BTMs to a new operator and start deriving revenue from this equipment. Mirch also insisted that such an arrangement was beneficial to S&P, because Taproot would be able to promptly collect and turn over S&P's cash to provide S&P with additional liquidity.

69.     Accordingly, pursuant to the term of the BTM Leases permitting the parties to agree to other arrangements for the cash pick ups, it was represented by Mirch and fully understood among the parties that Taproot and its representatives would collect S&P's cash during its conversion of machines, and that it would account for and remit those amounts to S&P.

70.     On information and belief, however, Mirch never planned to honor his false representations to S&P. Instead, by convincing S&P to allow Taproot to handle the cash pick up, Mirch and Taproot gained possession and control of another critical asset of S&P that he, Fernandez, and the Operator Defendants knew was essential to S&P being able to meet its ongoing financing obligations. And once Taproot's representatives took possession of the cash, they refused to account for what had been collected from which machines or turn it over to S&P.

17

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

71.     Again, taking control of these assets and effectively holding them hostage was part of the greater scheme perpetrated by Mirch, Fernandez, and the Operator Defendants through Taproot. By defrauding S&P into believing that Taproot was merely trying to speed up the conversion process and put more money in each of the parties' pockets, Mirch convinced S&P to relinquish control over the cash collection process and rendered S&P vulnerable to additional attacks when these assets were ultimately withheld.

72.     Additionally, while most of S&P's BTMs could be accessed using certain codes that S&P provided to Mirch for this cash collection and conversion process, certain BTMs lock codes were not available to S&P because they had been set up by a third-party carrier. To the extent a lock needed to be drilled or otherwise opened because the code to open the BTM was in the possession of a third party, S&P agreed to pay for a replacement lock only for those machines.

73.     But Taproot and its representatives abused the limited authority granted by S&P and unnecessarily drilled numerous locks that could have been opened using codes in possession of the parties. On information and belief, Taproot did so as part of the greater fraudulent scheme being employed by Mirch, Fernandez, and the Operator Defendants through Taproot to steal S&P's cash from these BTMs without S&P being able to track their activities. Mirch, Fernandez, and the Operator Defendants were also eager to take over these machines for their own use and did not want S&P to have knowledge of when particular BTMs had been migrated to new operators.

74.     Without reliable records of the various machines drilled and the cash that was extracted, Mirch knew that Taproot would be in a position to deny that it collected cash from certain machines and that these amounts were lost due to theft or vandalism. Indeed, although Taproot had agreed to promptly report what cash had been collected and from which locations it was collected, so that S&P could compare these amounts to its records and, if necessary, file

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

appropriate police reports if cash was missing, Taproot never did so.  Despite numerous additional requests from S&P to provide documentation regarding the amount and various locations of cash collected, Mirch and Taproot have failed to provide this information.

75.    Further, Taproot initially refused to remit any of the collected funds to S&P and held the cash hostage as it sought to renegotiate new more favorable terms as to the use of S&P's fleet of BTMs. Only after S&P sued Taproot did Taproot remit some of the collected cash ($453,965) and falsely claim that those were the only funds it collected. To date, Taproot has never provided reliable data as to the cash collected from S&P's machines (and which machine it was collected) as it knows that this information would be able to be cross referenced against S&P's records showing what cash remained in these same BTMs at the time of their conversion by Taproot. On information and belief, Taproot and its agents have improperly converted the balance of S&P's cash removed from the BTMs in violation of S&P's clear right to this cash.

76.    This is not a scam unique to S&P either. On information and belief, Mirch and Taproot also participated in similar misconduct with respect to Cryptobase, one of the operators that had subleased S&P's BTMs from Taproot.

77.    More specifically, Cryptobase entered into an agreement with Taproot whereby Cryptobase would make payments to  Coin for use of S&P's BTMs and once certain amounts were paid it would gain title to the S&P BTMs it was leasing. On information and belief, Cryptobase then made the requisite payments but Taproot did not remit title to the subject BTMs.  This was, of course, because Taproot did not have title to the BTMs, which remained owned by S&P.

78.    When Cryptobase learned that Taproot had not paid S&P or obtained title to the BTMs in question, it filed suit against Taproot. On information and belief, shortly thereafter Mirch ordered the BTMs operated by Cryptobase to be drilled without Cryptobase's consent and removed

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

the cash belonging to Cryptobase. On information and belief, Mirch and/or Taproot has held Cryptobase's cash hostage to assert leverage over Cryptobase and its lawsuit. Further, on information and belief, just like was the case with Taproot, Mirch has represented that the cash collected from Cryptobase represents only a small percentage of the amounts Cryptobase believes were in the subject BTMs.

79.    Mirch, Fernandez, Taproot and the Operator Defendants have acted in bad faith in numerous other ways as well.

80.    For instance, on information and belief, there are numerous BTM Locations that Taproot never contacted, even though Mirch represented that they intended to convert all of S&P's BTMs other than those located in Ohio. S&P only learned this fact after they finally reached out to some of the BTM Locations to see if they had been contacted by Taproot (since Taproot itself had failed to provide this information). Inherent in S&P granting Taproot rights to its equipment and otherwise facilitating its takeover at the BTM Locations was the understanding that Taproot would make every effort to timely utilize any of the ATMs covered by the BTM Leases and start paying S&P rent. Not only did it fail to do so, but it acted in bad faith by not informing S&P of this fact, thus preventing S&P from timely leasing these BTMs to another operator.

81.    Similarly, Taproot claims that the Storage BTMs (which were brand new and did not require any negotiations with the BTM Locations) have not been deployed even though Taproot took possession of them months ago. Taproot has claimed that they have stored certain BTMs instead of deploying those BTMs as the parties contemplated, and further have claimed that S&P should pay these storage fees. To the contrary, S&P (1) was not aware that Taproot was putting BTMs in storage and never agreed to pay for this expense and (2) would have deployed

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

these BTMs elsewhere through other operators if it had been notified that Taproot was not deploying these BTMs.

82.    On information and belief, Taproot has also moved BTMs between locations and across state lines without notifying S&P to prevent S&P from being able to keep track of and/or repossess these BTMs. Because many of these machines serve as collateral to their related financing agreements, S&P has informed Taproot that it needs to know the specific location of the BTMs. Yet S&P has not received this information.

83.    Taproot's movement of machines was also part of the overall fraudulent scheme. While the BTM Leases provide that S&P may repossess the BTMs without further order of court when Taproot has defaulted on rent payments (a mechanism designed for this very scenario, where Taproot has effectively stolen S&P's machines and is using them without paying compensation), Taproot's movement of the BTMs in violation of the BTM Leases frustrates S&P's efforts in this regard.

84.    More specifically, without knowing which BTMs are at each BTM Location (or whether they are maintained elsewhere), S&P cannot be sure that the machines in question are S&P machines (because Taproot could have swapped them out with BTMs from other sources, in violation of the BTM Leases). In order to confirm that it is an S&P machine, in many cases S&P would have to drill the BTM open and confirm the serial number, which would be improper if the BTM turned out to be a non-S&P BTM.

85.    Additionally, on information and belief, Mirch, Fernandez, Taproot, and/or the Operator Defendants have stolen and possess BTMs that they have represented to S&P they do not possess. On information and belief, these defendants have removed these BTMs from their original

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

locations (including transferring them across state lines) and deployed them in unknown locations and/or otherwise secreted them away for future use.

86.    One specific (but non-exhaustive) example of this misconduct relate to S&P's BTMs that were manufactured by "American Kiosk.". Despite readily acknowledging that they are not using these BTMs (and thus, not paying any rent), and despite demands by S&P to return them, Mirch, Fernandez, Taproot, and/or the Operator Defendants have refused to turn these BTMs back over to S&P. Instead, on information and belief, these defendants have removed the American Kiosk BTMs from their BTM Locations, transferred them across state lines, and secreted them away so S&P cannot utilize them to generate much needed income.

87.    The final piece of the fraudulent scheme perpetrated by Mirch, Fernandez, and the Operator Defendants was to take advantage of S&P's weakened state as a result of the pervasive fraudulent activities detailed above.

88.    More specifically, Mirch, Fernandez, and the other Operator Defendants waited for what they knew would inevitably occur. Namely, without the funds promised to be paid by Taproot and without the majority of the cash residing in S&P's BTMs at the time of conversion, S&P was unable to meet its obligations to its creditors.

89.    Mirch, Fernandez, and the other Operator Defendants were aware of these debts and the specific third party financers, including AvTech capital because this information was disclosed to Mirch and Fernandez during the negotiation of the BTM Leases.

90.    Mirch, Fernandez, and the other Operator Defendants used S&P's impending defaults and the pressure it caused S&P to seek to renegotiate the BTM Leases, seeking millions of dollars in offsets for back rent and other expenses that were not part of the original agreement

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

between Taproot and S&P. They also used this leveraged position to try to force S&P to sell its vast inventory of valuable BTMs to Taproot for less than market value.

91.    When S&P refused to bend to these underhanded tactics, and S&P actually defaulted on these obligations as a direct result of the fraudulent conduct of Mirch, Fernandez, Taproot, and the other Operator Defendants, they went even a step further. More specifically, on information and belief, Mirch, Fernandez, Taproot, the other Operator Defendants, and/or other companies affiliated with Mirch and/or Fernandez contacted one of S&P's creditors, AvTech Capital and purchased S&P's debt at a discount to its face value.

92.    S&P would not have been in default with AvTech Capital absent the fraudulent conduct of Mirch, Fernandez, Taproot and the other Operator Defendants. Indeed, S&P had refinanced its debt with AvTech Capital to specifically align with the payments it was set to receive from Taproot.

93.    On information and belief, Mirch, Fernandez, and the other Operator Defendants, acting through Taproot, plan to attempt to use the entire default amount from AvTech Capital as an offset to the amounts Taproot owes under the BTM Leases and otherwise. In other words, on information and belief, these defendants perpetrated a fraudulent scheme to deprive S&P of its ability to pay its creditors, swooped in and purchased S&P's defaulted debt (which they caused due to their pattern of fraudulent activity) for a fraction of the cost, and now, in a court of equity, will assert that they should get the benefit of the entire default amount as a set off to amounts properly owed to S&P.

94.    On information and belief, the Defendants here have utilized the information provided by S&P and taking over the vast majority of the BTMs identified in the BTM Leases, as well as the Storage BTMs.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

95.     On information and belief, Defendants have even taken over certain BTMs that remain at BTM Locations despite not entering into a new lease with the BTM Locations. In other words, Taproot has converted certain machines at the BTM Locations and migrated them to the Operator Defendants and/or third party operators, but have not taken over or otherwise substituted *Taproot* for the lease obligations of S&P.

96.     After seizing control of a significant portion of S&P's BTM fleet, Taproot subcontracted the BTMs to Defendants *Powercoin* and *Bitstop.*

97.     Defendants *Powercoin* and *Bitstop* are each currently operating a portion of S&P's BTM fleet and obtaining revenue from their operation.

98.     There is no agreement between the collective of S&P and Mirch, Fernandez, *Powercoin*, or *Bitstop* that governs their relationship.

99.     Defendants *Powercoin* and *Bitstop* are unjustly retaining the benefit of the use S&P's BTMs to S&P's detriment, including through the collection of transaction fees, without having negotiated any arrangement with S&P for their use.

100.    Defendants *Powercoin* and *Bitstop* have been enriched through the operation of S&P's BTMs, including through the collection of transaction fees, software fees, and conversion fees. On information and belief, *Powercoin* and *Bitstop* have each received tens of thousands of dollars in revenues from the operation of S&P's BTMs. On information and belief Mirch and Fernandez have benefitted personally from *Powercoin* and *Bitstop's* income from the unauthorized use of S&P's BTMs.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

101.    S&P has not received compensation from Mirch, Fernandez, *Powercoin* or *Bitstop* for the use of S&P's BTM fleet.

102.    Mirch, Fernandez, *Powercoin* and *Bitstop's* retention of the benefit of the operations of S&P's BTM fleet, and the revenues generated thereby, violates the fundamental principles of justice, equity, and good conscience and operates to S&P's detriment.

103.    On information and belief, the Operator Defendants are deriving significant revenue from these BTMs, even though they are aware that no compensation has been paid to S&P.

104.    Despite receiving benefits flowing directly from the information and vast inventory of equipment supplied by S&P, *Taproot* and the other defendants have failed to compensate S&P in any way.

<u>**Count I**</u>

**(Breach of BTM Leases against Taproot)**

105.    The BTM Leases are valid and enforceable contracts.

106.    S&P fulfilled its obligations under the BTM Leases.

107.    Taproot has breached its obligations under the BTM Leases in one or more ways, including: (a) failing to take steps to terminate the Location Leases, (b) failing to pay rent due thereunder, and (c) failing to pay Success Fees that are due to S&P.

108.    *Taproot* has also violated the implied covenant of good faith and fair dealing by, among other things, failing to timely terminate the Location Leases, failing to make reasonable efforts to timely take over and migrate certain of S&P's BTMs, failing to make reasonable efforts

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

to timely contact all of the BTM Locations, and failing to provide timely information regarding its activities.

109.    As a direct and proximate result of Taproot's Breach of Contract, S&P sustained severe monetary damages and loss.

110.    Mirch and Fernandez are equally liable to S&P for the acts as described above.

111.    Primarily, for the task at hand which was the ownership, maintenance and control of thousands of bitcoin machines and millions of dollars, *Taproot* was severely undercapitalized. In fact, *Taproot* had little if any capital at all.

112.    Moreover, Taproot had zero if any corporate governance as it was merely a "strawman" entity created for the sole purpose of insulating the Operator Defendants as identifiable parties to an agreement with an entity which was under indictment in a highly regulated industry.

113.    *Taproot* was a Mirch-created entity that was <u>not</u> formed in an attempt to insolate Mirch, Fernandez, *Powercoin* and *BitStop* from liability; it was formed for the sole purpose of insolating Mirch and Fernandez from scrutiny. *Taproot* provided no actual service other than to: (a) cover up the true parties in contract (Mirch and Fernandez) with an indicted entity (S&P) in a regulated industry, (b) take in monies that were rightfully owed to S&P and (c) to utilize the entity to carry out Mirch and Fernandez's fraudulent scheme to convert all of S&P's assets.  That *Taproot* is essentially a shell and the *alter ego* of Mirch and Fernandez, whose creation was to shield Mirch and Fernandez from scrutiny and regulation.

**WHEREFORE**, S&P prays for judgment in its favor as to Count I and against Taproot in an amount far in excess of the $50,000 jurisdictional minimum, including without limitation its attorneys' fees for bringing this action, and for such injunctive relief as necessary to enforce

26

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

its contractual rights.

## Count II

### (Fraudulent Inducement of Securing the BTM Leases Against Taproot)
### Mirch, Fernandez and Taproot

114.    S&P adopts, realleges, and incorporates the above paragraphs as if fully recited

115.    In early March of 2023, S&P and several of its principles were investigated and criminally charged with operating certain BTMs in Northwest-Ohio without the requisite licensure, among other alleged violations.

116.    Defendants, Jordan Mirch, Jorge Fernandez and the businesses that they were associated with, including ATM Bitstop and Powercoin saw an opening to exploit S&P.  .

117.    S&P received an unsolicited communication from Mirch on March 2, 2023, shortly after the news broke of the Ohio charges. Mirch insisted that he and "his companies" could operate S&P's BTMs right away and save the S&P business.

118.    The communication from Mirch was false.  While Mirch relayed that his "companies" could operate the S&P BTMs right away, Mirch knew that none of his existing businesses would be operating any of the S&P BTMs right away and, in fact, Mirch knew that none of his existing companies would be contracting with S&P at all.

119.    The same day, Fernandez began communicating over text message with the wife of the principal owner of S&P, offering a proposal and promising "the business can be rescued if we act quickly and think creatively."

120.    The communication from Fernandez was false.  While Fernandez relayed that his "companies" could operate the S&P BTMs right away and that he could save the companies if everyone acted quickly enough, Fernandez knew that none of his existing companies would be contracting with S&P to provide services to S&P.

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

121.    Fernandez threatened that if S&P did not agree to a deal quickly, unnamed "mercenaries" would take S&P's accounts and destroy its business. He wrote, "every day that goes by is another day you allow your competitors to chop away at your business. As an example, I received a call this morning from some mercenaries in the market that are putting together a sales team to go after your accounts."

122.    Mirch and Fernandez were also aware of S&P's existing financial obligations, including the fact that a percentage of its BTM fleet was financed through arrangements with third party lenders, including *AvTech Capital*. Mirch and Fernandez promised that they and the Operator Defendants, including *Powercoin and Bitstop*,  could provide S&P with necessary cash flow to satisfy these and other obligations during its period of operational uncertainty.

123.    Indeed, Mirch and Fernandez told S&P that they and the Operator Defendants could quickly take over S&P's operations, work with S&P to terminate its existing Location Leases, and enter into new lease agreements with the owners of the BTM Locations.

124.    Essentially, the idea was that S&P would introduce Mirch and Fernandez to its BTM Locations as representatives of other BTM Operators that could take over and provide a seamless way to replace the lost lease income following S&P's cessation of operations. In exchange for use of S&P's inventory of thousands of BTMs worth nearly $20,000,000, S&P would receive certain timely payments so it would be able to meet existing financial obligations to its creditors, including to *AvTech Capital.*

125.    But despite painting themselves as the "saviors" of S&P, Mirch and Fernandez, and the Operator Defendants that they represented were merely misleading S&P. Indeed, their ultimate goal was to fraudulently induce S&P to enter into a deal that they would profit extensively from without having to fairly compensate S&P.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

126.    Indeed, Mirch's and Fernandez's false statements during the negotiations between the parties, including that Mirch, Fernandez and the Operator Defendants would provide necessary cashflow so S&P could satisfy its ongoing debt obligations, were part of a larger scheme to defraud S&P.

127.    The negotiations between the parties, which primarily occurred in March and April 2023, were conducted by Mirch, Fernandez, and their counsel, Jordan Finfer.

128.    During these negotiations,  Mirch and Fernandez insisted of S&P, that a single purpose company, *Taproot*, would have to be created to carry out the takeover of S&P's BTMs and be a party to the contract with S&P.

129.    At all times mentioned herein, while Mirch and Fernandez were negotiating with S&P, they were acting in their own best interest, and then eventually, in the best interest of their newly created entity, *Taproot.*

130.    Fernandez claimed that the Operator Defendants, *Bitstop* and *Powercoin* could not be signatories to the ultimate agreement with S&P in light of the charges facing S&P, and that *Taproot* was a necessary buffer for the Operator Defendants.

131.    That Fernandez's statements were false and were meant to induce S&P to contract with the newly created entity:  *Taproot*.

132.    The scheme to defraud S&P was fairly simple.  Mirch and Fernandez would mislead S&P with numerous false statements about the need to create *Taproot*, to ultimately protect the Operator Defendants from exposure and/or liability.

133.    Specifically, the statements made by Mirch and Fernandez that neither themselves nor the Operator Defendants could contract with S&P was inherently false.  The Operator Defendants stood in the same position as *Taproot*, and the concept that everyone had to shield the

29

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

Operator Defendants from the exposure that S&P would bring them was an absolute false statement and both Mirch and Fernandez knew same. In essence, Mirch and Fernandez made those statements to shield S&P from the knowledge that Taproot would be leasing those BTMs to third parties such as *Bitstop* and *PowerCoin*.

134.    Why? Mirch and Fernandez falsely mislead S&P about the need to create *Taproot*, because if S&P uncovered that Mirch, Fernandez and *Taproot* would merely be leasing these machines to Operator Defendants, they knew that S&P would never have contracted with *Taproot*. S&P could have negotiated its own leasing arrangements with other operators: it did not need *Taproot,* Mirch or Fernandez to perform that function.

135.    While *Taproot* was the ultimate contracting party, Mirch and Fernandez at all times knew that the profits derived from S&P's BTMs would flow directly to Mirch, Fernandez and the Operator Defendants. They did this all, knowing that S&P had the ability to contract independently and directly with operators who did not require a strawman to carry out the contractual arrangement.

136.    Mirch, Ferandez and *Taproot* through false and misleading statements, induced S&P to enter into certain agreements knowing *Taproot* would never perform under those agreements and did so as part of a larger scheme to gain access to S&P's BTM fleet and valuable information S&P possessed regarding the BTM Locations and the terms of the Location Leases without paying fair compensation.

137.    More specifically, at all relevant times, these Defendants sought to further imperil S&P through Taproot's failure to pay rightful amounts owed to S&P, as these Defendants knew such action would put S&P in a compromised position with its creditors. As described more fully below, these Defendants end goal was to put S&P in an inescapably leveraged position and

30

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

essentially hold any payments hostage until S&P favorably renegotiated the terms of the parties'

agreement or the Defendants could otherwise exploit S&P's compromised position.

138.    In early April 2023, and in reliance upon the false statements made by Mirch,

Ferande and *Taproot*, the Plaintiff, S&P entered into certain lease agreements for the use of S&P's

BTMs ("BTM Leases") with *Taproot*. *See* Exhibits 1 & 2.  At Mirch's repeated urging, S&P also

agreed to provide valuable information regarding the identities and terms of its Location Leases.

139.    At all times material hereto, the Defendants Mirch & Fernandez were acting as

agents of their principal, Taproot, and all of the statements made by Mirch and Fernandez, were

meant to further the interests of Taproot.

140.    , and Taproot induced S&P to enter into the BTM Lease agreements knowing

Taproot would never perform under those agreements. These Defendants did so as part of a larger

scheme to gain access to valuable information S&P possessed regarding the BTM Locations and

the terms of the Location Leases.

141.    On information and belief, Mirch, Fernandez, and Taproot also sought to further

imperil S&P with the hope that this leveraged position would lead to a forced bargain sale of S&P's

valuable resources, which it had been attempting to acquire unsuccessfully for several years.

142.    More specifically, Defendants Mirch, Fernandez, and Taproot specifically

represented to S&P that Taproot was capable of and would take over S&P's vast network of BTMs

and start paying S&P rent and other fees to cover S&P's existing financial obligations. When S&P

objected to dealing with Taproot instead of the other established companies that Defendant

Fernandez was affiliated with, S&P was told that Taproot was a necessary buffer given S&P's

issues in Ohio, but that Fernandez and his affiliates would remain part of the deal behind the scenes.

143.    But at all relevant times, these Defendants never intended to make timely payments

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

under the parties' agreements and, instead, sought to (1) gain information and relationships with S&P's BTM Locations, (2) render S&P without the means to meet its existing obligations such that it would be financially vulnerable and may be compelled to sell its valuable assets to Defendants at below market rates, and (3) use the shell company Taproot as a liability shield in the event S&P ever fought back.

144.    Specifically, Mirch and Fernandez, as agents of Taproot, made several false misrepresentations of fact that they knew were false, including:

a.    S&P would realize a cash flow from Mirch and Fernandez's operation of S&P's BTM Fleet, while Mirch and Fernandez knew at all times that they had no intention of turning over any revenue stream to S&P;

b.    That S&P could realize the cash that was contained in the existing machines, when Mirch and Fernandez, at times knew that they had no intentions of turning over the cash to S&P upon collection;

c.    That Mirch and Fernandez would work to turn over S&P's existing Location Leases to Mirch and Fernandez, when at all times mentioned herein, Mirch and Fernandez knew that they would never going to provide S&P with the revenue stream that would emanate from those Location Leases;

d.    That Mirch and Fernandez falsely communicated to S&P that the revenue stream which would be provided by the new location leases, would go to pay off S&P debt obligations, such as its debt to *AvTech*, when at all times, Mirch and Fernandez knew that they would essentially bleed out S&P by not turning rightfully owed monies to S&P, and in turn would buy the *AvTech* debt and become S&P's biggest creditor;

e.    Mirch further insisted that allowing Taproot to pick up the cash would benefit S&P, because Taproot and its representatives were already onsite to perform other conversion activities and could quickly recover the cash for S&P. In reality, Mirch, Fernandez and Taproot had no intention in turning over any cash to S&P and they in fact converted all of the cash for their own use.

f.    Defendants Mirch, Fernandez, and Taproot specifically represented to S&P that Taproot was capable of and would take over S&P's vast network of BTMs and start paying S&P rent and other fees to cover S&P's existing financial obligations.

145.    Defendants Mirch, Fernandez, and Taproot made the aforementioned

32

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

misrepresentations repeatedly and purposely as part of a scheme, and with the intent, to induce S&P to enter into the parties' various agreements so the Defendants could pursue the aforementioned ulterior motives.

146.    S&P reasonably believed these Defendants' false statements and justifiably relied on those misrepresentations to its detriment, including entering into the BTM and Vehicles Lease agreements and cooperating with Defendants to develop valuable business relationships for Defendants with the BTM Locations.

147.    At all times relevant, Defendants Mirch, Fernandez, and Taproot knew or should have known that S&P would rely on Defendants' false and fraudulent misrepresentations, as set forth above.

148.    As a result of Defendants' fraudulent practices, as aforesaid, and S&P's justifiable reliance on Defendants' misrepresentations, S&P suffered significant monetary damages, including without limitation the loss of opportunity to lease its BTMs to another third party that would have treated S&P fairly.

149.    Specifically, in relying upon Mirch and Fernandez false misrepresentations of material fact, S&P gave up its entire BTM Fleet to Mirch, Fernandez and Taproot, based upon the representations made above by Mirch and Fernandez.  Specifically, S&P had a significant revenue stream which allowed the company to meet its debt obligations.  Based upon its reliance upon the false misrepresentations of fact, S&P gave up its entire revenue stream and put it in the hands of Mirch and Fernandez who were conspiring to convert S&P's property.  As such, without a revenue stream, S&P has defaulted on its debt obligations, and in concert with Mirch and Fernandez's fraudulent scheme, Taproot has purchased S&P's most significant debt and now represents S&P's largest creditor.  As such, S&P has suffered severe and permanent monetary losses, including

33

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

divesting itself of its entire revenue stream.

## Count III

### (Civil Conspiracy-Taproot, PowerCoin and ATM Ops LLC d/b/a Bitstop)

150.    S&P adopts, realleges, and incorporates the above paragraphs as if fully recited herein.

151.    The Operator Defendants were in on Mirch, Fernandez and Taproot's scheme to defraud S&P from the beginning.   The Operator Defendants knew before *Taproot* ever contracted with S&P, that they were going to be the beneficiaries of Mirch, Fernandez and *Taproot's* fraud, as they would be given the opportunity to lease the BTMs without ever having to honor a single obligation to S&P.

152.    It was nearly a perfect scheme.   Mirch, Fernandez and *Taproot* knew that S&P had dozens of options to negotiate directly a sale of its business to any number of BTM Operators. Through material misrepresentations of fact. Mirch, Ferandez and Taproot, were able to convince that this "strawman" method would be the most effective way to manage the S&P BTMs.    In reality, the creation of Taproot was merely a way for Mirch and Fernandez to assume the operation and control of a highly profitable S&P.

153.    Indeed, Mirch and Fernandez told S&P that they and the Operator Defendants could quickly take over S&P's operations, work with S&P to terminate its existing Location Leases, and enter into new lease agreements with the owners of the BTM Locations.

154.    Essentially, the idea was that S&P would introduce Mirch and Fernandez to its BTM Locations as representatives of other BTM Operators that could take over and provide a seamless way to replace the lost lease income following S&P's cessation of operations. In exchange for use of S&P's inventory of thousands of BTMs worth nearly $20,000,000, S&P would

34

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

receive certain timely payments so it would be able to meet existing financial obligations to its creditors, including to *AvTech Capital.*

155.    But despite painting themselves as the "saviors" of S&P, Mirch and Fernandez, and the Operator Defendants that they represented were merely misleading S&P. Indeed, their ultimate goal was to fraudulently induce S&P to enter into a deal that they would profit extensively from without having to fairly compensate S&P.

156.    Indeed, Mirch's and Fernandez's false statements during the negotiations between the parties, including that Mirch, Fernandez and the Operator Defendants would provide necessary cashflow so S&P could satisfy its ongoing debt obligations, were part of a larger scheme to defraud S&P.  Mirch, Fernandez, and the Operator Defendants planned to take possession and control of S&P's income generating assets, including without limitation its BTMs and the BTM Locations, and then starve S&P.  Mirch, Fernandez, and the Operator Defendants knew that, without dominion over these assets, S&P would be unable to generate income from these assets and it would put the company in a more perilous position. This was the goal of Mirch, Fernandez, Bitstop and Powercoin all along; to render S&P more vulnerable to the Defendants' own subsequent attacks.

157.    The negotiations between the parties, which primarily occurred in March and April 2023, were conducted by Mirch, Fernandez, and their counsel, Jordan Finfer. Based on Mirch and Fernandez's representations to S&P, and Fernandez's known affiliation with the Operator Defendants, S&P understood at first that it was negotiating with Mirch and Fernandez as representatives of the Operator Defendants, *Bitstop* and *PowerCoin*.

158.    It was only later that Mirch and Fernandez insisted that a single purpose company, *Taproot*, would be created to carry out the takeover of S&P's BTMs and be a party to the contract with S&P.  This was all part of the common plan or scheme in which the Operator Defendants all

took part.

159.    Fernandez claimed that the Operator Defendants, *Bitstop* and *Powercoin* could not be signatories to the ultimate agreement with S&P in light of the charges facing S&P, and that *Taproot* was a necessary buffer for the Operator Defendants.

160.    In reality, had S&P not reached an agreement with the Defendants, Mirch, Fernandez and Taproot, S&P could have alternatively leased its BTMs (and shared their corresponding BTM Locations) with other BTM operators in the space, including without limitation *Cryptobase* and *Athena Global*. Indeed, these same operators ultimately ended up subleasing some of S&P's BTMs from Taproot.

161.    On information and belief, Mirch, Fernandez, and the Operator Defendants used *Taproot* as an instrumentality for their related business interests and as part of their greater scheme to defraud S&P and this was the common scheme or plan of which PowerCoin and Bitstop were in on from the beginning. While Taproot was the ultimate contracting party, on information and belief, Mirch, Fernandez and the Operator Defendants knew that many of the profits and other benefits derived from S&P's BTMs would flow directly to Mirch, Fernandez, the Operator Defendants, and other affiliates of these parties. Further, on information and belief, at all relevant times, Mirch, Fernandez, and the Operator Defendants intended to use Taproot as a liability shield for their fraudulent activity.

162.    It has now become clear that Mirch, Fernandez, the Operator Defendants, and the entity set up to shield their liability (Taproot) did not enter into a business relationship with S&P in good faith. Instead, these Defendants induced S&P to enter into certain agreements knowing Taproot would never perform under those agreements and did so as part of a larger scheme to gain access to S&P's BTM fleet and valuable information S&P possessed regarding the BTM Locations

FILED DATE: 4/29/2025 9:11 AM    2023CH06098

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

and the terms of the Location Leases without paying fair compensation. More specifically, at all relevant times, these Defendants sought to further imperil S&P through Taproot's failure to pay rightful amounts owed to S&P, as these Defendants knew such action would put S&P in a compromised position with its creditors. As described more fully below, these Defendants end goal was to put S&P in an inescapably leveraged position and essentially hold any payments hostage until S&P favorably renegotiated the terms of the parties' agreement or the Defendants could otherwise exploit S&P's compromised position.

163.    Defendants, Taproot, PowerCoin and ATM Ops LLC d/b/a Bitstop have taken over BTMs that remain at BTM Locations despite not entering into a new lease with the BTM Location. In other words, Taproot has converted certain machines at the BTM Locations and migrated them to the Operator Defendants including PowerCoin and ATM Ops LLC d/b/a Bitstop.

164.    Defendants Powercoin and Bitstop are each currently operating a portion of S&P's BTM fleet and obtaining revenue from their operation.

165.    That Taproot, PowerCoin and Bitstop have conspired to deprive S&P of the duly owed revenue that has been denied to S&P, from the operation of the S&P BTM Fleet.

166.    That Taproot, PowerCoin and Bitstop through their concerted actions have acted for the unlawful purpose of depriving S&P of their revenue from the BTM Fleet and have converted S&Ps funds to that end.

167.    That Taproot, PowerCoin and Bitstop have all taken the overt act of contracting with each other to assume the S&P BTM fleet, and have further entered into agreements with BTM Laocations for the purpose of utilizing the S&P BTM fleet, with at all times knowing that none of these Defendants would compensate S&P for revenue generated by S&P's BTM Fleet, and S&P

37

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

has sustained severe monetary damages as a result.

## Count IV

**(PowerCoin-Aiding and Abetting Taproot's Conversion of S&P's property)**

168.    S&P adopts, realleges, and incorporates the above paragraphs as if fully recited herein.

169.    Shortly after the BTM Leases were executed, Mirch started to insist that *Taproot* and its affiliates, including the Operator Defendants, such as *PowerCoin* and *Bitstop*, to the extent they participated in the conversion of a particular BTM, should pick up the cash. In order to pull this off, PowerCoin and Bitstop would have to be knowing and willing participants in the scheme to allow Taproot to convert the cash in the machines that were being leased by *Bitstop* and *PowerCoin.*   Without *Bitstop* and *Powercoin's* participation, Taproot could not have converted the cash in the machines that were being leased by *Bitstop* and *PowerCoin.*

170.    Taproot converted the cash that rightfully belonged to S&P, and we know this to be true because Taproot after being called out on its conversion of cash, turned over hundreds of thousands of dollars directly to S&P during the course of this litigation.

171.    Mirch insisted that this was in both parties' best interest because Taproot and its representatives were already onsite to perform other conversion activities and could quickly recover the cash for S&P. Although S&P initially resisted, Mirch was adamant that *Taproot* and its representatives be permitted to pick up the cash and that it was beneficial for *Taproot* because they could immediately migrate the BTMs to a new operator and start deriving revenue from this equipment. Mirch also insisted that such an arrangement was beneficial to S&P, because Taproot would be able to promptly collect and turn over S&P's cash to provide S&P with additional liquidity.

38

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

172.    The subject cash belonged to S&P, and the cash is identifiable.  Taproot converted the cash that was located within the S&P machines for its own benefit.

173.    The Defendants Taproot, Mirch, Fernandez and PowerCoin collected the cash that was the duly owned property of S&P; however, the Defendants have refused to turn over the cash upon collection.

174.    Taproot, Mirch, Fernandez and PowerCoin participated in the conversion of the cash which was collected from the existing machines, when they failed to turn over the existing cash to S&P.

175.    The subject cash is at all times material hereto, the rightful property of S&P.

176.    That S&P has made repeated demands for the Defendants to turn over the subject cash to S&P.

177.    Taproot could never have converted the cash that was located within the  BTMs that were leased by PowerCoin without the active participation of PowerCoin.

178.    That at all times mentioned herein, *PowerCoin* knew that Taproot was unlawfully converting the property of S&P, and these PowerCoin further knew that S&P's property did not properly belong to *Taproot*.

179.    That the Defendant, *Powercoin*, as an Operator, provided substantial assistance to Taproot in unlawfully converting the property of S&P. *Powercoin* was an actual collector and converter of the property that rightfully belonged to S&P.

180.    As a direct and proximate result of the above acts,  S&P has sustained severe and permanent monetary damages as a result thereof.

**WHEREFORE**, S&P prays for a judgment in his favor as to Count IV and against

39

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

PowerCoin in an amount far in excess of the $50,000 jurisdictional minimum as well as constructive, equitable and injunctive relief as the Court deems just and appropriate.

## Count V

### (Bitstop-Aiding and Abetting Taproot's Conversion of S&P's property)

181.    S&P adopts, realleges, and incorporates the above paragraphs as if fully recited herein.

182.    Shortly after the BTM Leases were executed, Mirch started to insist that *Taproot* and its affiliates, including the Operator Defendants, such as *PowerCoin* and *Bitstop*, to the extent they participated in the conversion of a particular BTM, should pick up the cash. In order to pull this off, PowerCoin and Bitstop would have to be knowing and willing participants in the scheme to allow Taproot to convert the cash in the machines that were being leased by *Bitstop* and *PowerCoin*.  Without *Bitstop* and *Powercoin's* participation, Taproot could not have converted the cash in the machines that were being leased by *Bitstop* and *PowerCoin.*

183.    Taproot converted the cash that rightfully belonged to S&P, and we know this to be true because Taproot after being called out on its conversion of cash, turned over hundreds of thousands of dollars directly to S&P during the course of this litigation.

184.    Mirch insisted that this was in both parties' best interest because Taproot and its representatives were already onsite to perform other conversion activities and could quickly recover the cash for S&P. Although S&P initially resisted, Mirch was adamant that *Taproot* and its representatives be permitted to pick up the cash and that it was beneficial for *Taproot* because they could immediately migrate the BTMs to a new operator and start deriving revenue from this equipment. Mirch also insisted that such an arrangement was beneficial to S&P, because Taproot would be able to promptly collect and turn over S&P's cash to provide S&P with additional

40

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

liquidity.

185.    The subject cash belonged to S&P, and the cash is identifiable.  Taproot converted
the cash that was located within the S&P machines for its own benefit.

186.    The Defendants Taproot, Mirch, Fernandez and *Bitstop* collected the cash that was
the duly owned property of S&P; however, the Defendants have refused to turn over the cash upon
collection.

187.    Taproot, Mirch, Fernandez and *Bitstop* participated in the conversion of the cash
which was collected from the existing machines, when they failed to turn over the existing cash to
S&P.

188.    The subject cash is at all times material hereto, the rightful property of S&P.

189.    That S&P has made repeated demands for the Defendants to turn over the subject
cash to S&P.

190.    Taproot could never have converted the cash that was located within the  BTMs
that were leased by *Bitstop* without the active participation of *Bitstop*.

191.    That at all times mentioned herein, *Bitstop* knew that Taproot was unlawfully
converting the property of S&P, and these Bitstop further knew that S&P's property did not
properly belong to *Taproot*.

192.    That the Defendant, *Bitstop* as an Operator, provided substantial assistance to
Taproot in unlawfully converting the property of S&P. *Bitstop* was an actual collector and converter
of the property that rightfully belonged to S&P.

193.    As a direct and proximate result of the above acts,  S&P has sustained severe and
permanent monetary damages as a result thereof.

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

**WHEREFORE**, S&P prays for a judgment in his favor as to Count V and against *Bitstop* in an amount far in excess of the $50,000 jurisdictional minimum as well as constructive, equitable and injunctive relief as the Court deems just and appropriate.

## Count VI

### (Taproot- Breach of Oral Contract)

194.    S&P adopts, realleges, and incorporates the above paragraphs as if fully recited herein.

195.    Shortly after entering into the BTM Leases, S&P and Taproot entered into an oral agreement concerning the collection of existing cash residing in S&P's inventory of BTMs.

196.    Namely, while S&P could still take steps to collect this cash, Taproot would also pick up cash when Taproot took over the BTMs for its use.

197.    Both S&P and Taproot benefitted from this arrangement as it meant that Taproot could start utilizing the BTMs for its own purposes and start deriving revenue from this equipment, and beneficial to S&P, who would more quickly receive the existing cash in the BTMs.

198.    S&P agreed to pay for a replacement lock for any BTMs that needed to be drilled or otherwise opened because the code to open the BTM was in the possession of a third party. No other expenses were agreed to as between the parties.

199.    The parties' oral agreement is valid and enforceable.

200.    Taproot has collected cash from BTMs it has taken over (and even those they have not) pursuant to the parties' oral agreement.

201.    Defendant Taproot has breached the parties' oral agreement by failing to remit the

42

majority of the collected cash to S&P.

202.    S&P has been damaged as a result of Defendants' breach

**WHEREFORE**, S&P prays for a judgment in his favor as to Count VI and against Defendant Taproot an amount far in excess of the $50,000 jurisdictional minimum *and* for substantial punitive damages as determined by the jury, as well as constructive, equitable and injunctive relief as the Court deems just and appropriate.

## **Count VII**

### **(Conversion Against Taproot )**

203.    S&P adopts, realleges, and incorporates the above paragraphs as if fully recited.

204.    At the time of the written agreement between S&P and Taproot, the cash money that remained in the existing BTMs belonged to S&P.  Taproot had no interest in the cash that remained in the BTMs that were now to be operated, maintained, managed and controlled by *Taproot.*  There existed a specific provision within the agreement that addressed the cash that was to be held within the subject BTMs.

205.    Shortly after the BTM Leases were executed, Mirch started to insist that *Taproot* and its affiliates, including the Operator Defendants to the extent they participated in the conversion of a particular BTM, should pick up the cash. Mirch insisted that this was in both parties' best interest because Taproot and its representatives were already onsite to perform other conversion activities and could quickly recover the cash for S&P. Although S&P initially resisted, Mirch was adamant that Taproot and its representatives be permitted to pick up the cash and that it was beneficial for Taproot because they could immediately migrate the BTMs to a new operator and start deriving revenue from this equipment. Mirch also insisted that such an arrangement was beneficial to S&P, because Taproot would be able to promptly collect and turn over S&P's cash

FILED DATE: 4/29/2025 9:11 AM  2023CH06098

43

FILED DATE: 4/29/2025 9:11 AM   2023CH06098

to provide S&P with additional liquidity. The subject cash belonged to S&P, and the cash is identifiable.

138.    The Defendant Taproot and its Operators collected the cash that was the duly owned property of S&P; however, the Taproot has refused to turn over the cash upon collection.

159    The subject cash is at all times material hereto, the rightful property of S&P.

160.    That S&P has made repeated demands for the Defendants to turn over the subject cash to S&P. That at all times mentioned herein, Taproot knew that it was unlawfully converting the property of S&P, and these Defendants further knew that S&P's property did not properly belong to Taproot.  S&P has been damaged as a result of Taproot's conduct in the amount of money that was collected from the BTM Fleet and never turned over to S&P.

**WHEREFORE**, S&P prays for a judgment in his favor as to Count VII and against Defendant Taproot in an amount far in excess of the $50,000 jurisdictional minimum *and* for substantial punitive damages as determined by the jury, as well as constructive, equitable and injunctive relief as the Court deems just and appropriate.

Dated: April 28, 2025

BY: _____
              Donald J. Angelini, Jr.

Donald J. Angelini, Jr.
Angelini & DiLeo, P.C.
Firm No. 6194334
700 Commerce Drive Suite 500
Oak Brook, Illinois, 60523
P: (312) 900 0100
donald@angelinidileo.com

44

## SUPPLEMENT TO SCHEDULE A/B:
## ASSETS – REAL AND PERSONAL PROPERTY

**75.8/75.9** Claim against Taproot Acquisition Enterprises, LLC ("**Taproot**") for payments due under (i) April 1, 2023 Equipment Lease Agreement between SandP Solutions, LLC ("**Debtor**"), as Lessor, and Taproot Acquisition Enterprises, LLC, as Lessee ("**Lease A**"); and (ii) April 7, 2023 Equipment Lease Agreement between SandP Solutions, LLC, as Lessor, and Taproot Acquisition Enterprises, LLC, as Lessee ("**Lease B**").

**Calculation of Rent and Late Fees Due Under Lease A and Lease B**

**Lease A – 1,656 Bitcoin ATMs**[1]

| | |
|---|---|
| Rent (May 2023 through Petition Date): | $8,048,160.00 |
| 5% Late Fees: | $402,408.00 |
| Success Fees: | $1,656,000.00 |
| Lease A Total: | $10,106,568.00 |

**Lease B – 1,130 Bitcoin ATMs**

| | |
|---|---|
| Rent [331 AK Machines] (May 2023 through Petition Date):[2] | $1,608,660.00 |
| Rent [563 Genmega Machines] (May 2023 through August 12, 2024]:[3] | $1,520,100.00 |
| Rent [36 Genmega Machines] (May 2023 through Petition Date):[4] | $174,960.00 |
| Rent [200 Genmega Machines] (May 2023 through Petition Date):[5] | $972,000.00 |
| Lease B Subtotal: | $4,275,720.00 |
| 5% Late Fees: | $213,786.00 |
| Success Fees: | $1,130,000.00 |
| Lease B Total: | $5,855,506.00 |
| **Total Lease A and Lease B:** | **$15,962,074.00** |

| | |
|---|---|
| **Cash in Bitcoin ATM Bill Acceptors** | **$2,215,887.00** |

---

[1] The Lease A machines were owned outright by Debtor at the time of Lease A.
[2] These machines were under a purchase security agreement with Captech Financial, LLC at the time of Lease B.
[3] These machines were under a lease with Avtech Capital, LLC at the time of Lease B.
[4] These machines were under a purchase security agreement with CIT at the time of Lease B.
[5] These machines were under a loan with BankProv at the time of Lease B.

Debtor     **SandP Solutions LLC, dba Bitcoin of America**                    Case number *(If known)* _____
              Name

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $0.00 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $7,623.25 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. **Real property.** *Copy line 56, Part 9* ............................................> | | $0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $18,177,961.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $18,185,584.25 | + 91b. $0.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $18,185,584.25 |

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 6

| Fill in this information to identify the case: |
|---|
| Debtor name **SandP Solutions LLC, dba Bitcoin of America** |
| United States Bankruptcy Court for the:   NORTHERN DISTRICT OF ILLINOIS |
| Case number (if known) _____ |

☐ Check if this is an
amended filing

## Official Form 206D
## Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☑ Yes. Fill in all of the information below.

**Part 1:    List Creditors Who Have Secured Claims**

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A
Amount of claim
Do not deduct the value of collateral. | Column B
Value of collateral that supports this claim |
|---|---|---|

| 2.1 | **CIT** | Describe debtor's property that is subject to a lien | **$93,679.00** | **Unknown** |
|---|---|---|---|---|

| **CIT**
Creditor's Name | **Bitcoin ATMs (36 count) financed by CIT Group, Inc. pursuant to Master EFA Agreement #ME01898925.** |
|---|---|

**155 Commerce Way**
**Portsmouth, NH 03801**
Creditor's mailing address

Describe the lien
**Purchase Money Security**
Is the creditor an insider or related party?

Creditor's email address, if known

■ No
☐ Yes
Is anyone else liable on this claim?

**Date debt was incurred**
**07/16/2021**
**Last 4 digits of account number**
**UCC1,4489**

■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Do multiple creditors have an interest in the same property?

As of the petition filing date, the claim is:
Check that all apply

■ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

☐ Contingent
☐ Unliquidated
■ Disputed

---

| 2.2 | **State of Ohio** | Describe debtor's property that is subject to a lien | $70,098.00 | Unknown |
|---|---|---|---|---|

Creditor's Name
**State of Ohio**

**Lien for Federal Income Tax Due**

**Franklin Common Pleas Court**
**345 S High St**
**Columbus, OH 43215**
Creditor's mailing address

Describe the lien

Is the creditor an insider or related party?

Creditor's email address, if known

■ No
☐ Yes
Is anyone else liable on this claim?

**Date debt was incurred**
**12/13/2024**
**Last 4 digits of account number**
**4222**

■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Do multiple creditors have an interest in the same property?

As of the petition filing date, the claim is:
Check that all apply

Debtor   **SandP Solutions LLC, dba Bitcoin of America**

Name

Case number (if known) _____

■ No
☐ Yes. Specify each creditor,
including this creditor and its relative
priority.
_____

☐ Contingent
☐ Unliquidated
■ Disputed

| 2.3 | **State of Pennsylvania** | | Describe debtor's property that is subject to a lien | $28,148.00 | Unknown |
|---|---|---|---|---|---|

Creditor's Name

**Cumberland Court of
Common Pleas
601 Commonwealth Ave,
Ste. 1500
Harrisburg, PA 17120**

**Federal Income Tax Due for 2022**

Creditor's mailing address

**Describe the lien**
_____

**Is the creditor an insider or related party?**

Creditor's email address, if known

■ No
☐ Yes

**Is anyone else liable on this claim?**

**Date debt was incurred
06/14/2024**

■ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Last 4 digits of account number
6147**

**Do multiple creditors have an
interest in the same property?**

**As of the petition filing date, the claim is:**
Check all that apply

■ No
☐ Yes. Specify each creditor,
including this creditor and its relative
priority.
_____

☐ Contingent
☐ Unliquidated
■ Disputed

---

3.   Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.   $191,925.00

| **Part 2:** | **List Others to Be Notified for a Debt Already Listed in Part 1** |
|---|---|

List in alphabetical order any others who must notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name  and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| **CHTD Company
PO Box 2576
Springfield, IL 62708-2576** | Line   2.1 | |

| Fill in this information to identify the case: |
|---|

Debtor name **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the: NORTHERN DISTRICT OF ILLINOIS

Case number (if known) _____

☐ Check if this is an amended filing

# Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims                12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and
Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and
2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:**    List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ■ No. Go to Part 2.

   ☐ Yes. Go to line 2.

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill
   out and attach the Additional Page of Part 2.

|  | | Amount of claim |
|---|---|---|

| 3.1 | Nonpriority creditor's name and mailing address<br>**ADT**<br>**1501 Yamoto Rd**<br>**Boca Raton, FL 33431**<br><br>Date(s) debt was incurred _<br><br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: __Office security__<br><br>Is the claim subject to offset? ■ No  ☐ Yes | **$443.53** |
|---|---|---|

| 3.2 | Nonpriority creditor's name and mailing address<br>**American Express**<br>**PO Box 96001**<br>**Los Angeles, CA 90096-8000**<br><br>Date(s) debt was incurred _<br><br>Last 4 digits of account number __1001__ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: __Credit Card__<br><br>Is the claim subject to offset? ■ No  ☐ Yes | **$137,313.56** |

| 3.3 | Nonpriority creditor's name and mailing address<br>**American Kiosk**<br>**10901 W. 120th Ave**<br>**Broomfield, CO 80021**<br><br>Date(s) debt was incurred _<br><br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: __Loan__<br><br>Is the claim subject to offset? ■ No  ☐ Yes | **$150,000.00** |

| 3.4 | Nonpriority creditor's name and mailing address<br>**Ana Leiva**<br>**15 Lexington Dr.**<br>**Freedom, PA 15042**<br><br>Date(s) debt was incurred __1/24/2023__<br><br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: __Machine maintenance__<br><br>Is the claim subject to offset? ■ No  ☐ Yes | **$750.00** |

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.5** | Nonpriority creditor's name and mailing address

**Anna Knight**
**2633 E Victory Ct.**
**OWENSBORO, KY 42303**

Date(s) debt was incurred  **3/1/2023**

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                      **$2,220.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ☐ No  ☐ Yes

---

**3.6** | Nonpriority creditor's name and mailing address

**Archie Thompson**
**2001 TREE VISTA LANE**
**RALEIGH, NC 27604**

Date(s) debt was incurred  **3/1/2023**

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                        **$90.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.7** | Nonpriority creditor's name and mailing address

**ATM Solutions, Inc.**
**551 Northland Blvd**
**Cincinnati, OH 45240**

Date(s) debt was incurred  _

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                    **$46,474.78**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Armored car carrier services**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.8** | Nonpriority creditor's name and mailing address

**Barbara Alvey**
**711VINEST**
**ROCKPORT, IN 47635**

Date(s) debt was incurred  **3/1/2023**

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                       **$150.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.9** | Nonpriority creditor's name and mailing address

**Betty  Ruiz**
**307 Ellis Ave**
**Red Oak, TX 75154**

Date(s) debt was incurred  **3/1/2023**

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                       **$550.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ☐ No  ☐ Yes

---

**3.10** | Nonpriority creditor's name and mailing address

**Bibbeo**
**19531 E. 32nd Pkwy**
**Aurora, CO 80011**

Date(s) debt was incurred  _

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                     **$4,413.36**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **ATM maintenance**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.11** | Nonpriority creditor's name and mailing address

**BlockScore, Inc.**
**459 Hamilton Ave**
**Palo Alto, CA 94301**

Date(s) debt was incurred  _

Last 4 digits of account number  _

As of the petition filing date, the claim is: *Check all that apply.*                                       **$138.60**

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **ID Verification**

Is the claim subject to offset? ■ No  ☐ Yes

---

Debtor   **SandP Solutions LLC, dba Bitcoin of America**                      Case number (if known) _____
_____
Name

---

| 3.12 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$5,000.00** |
|---|---|---|---|

**Bonnie Hino**
**717 PINE DRIVE**
**TORRANCE, CA 90501**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Last 4 digits of account number _

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.13 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$800.00** |
|---|---|---|---|

**Brandon Freeman**
**1900 N NORDICA AVE**
**CHICAGO, IL 60707**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Last 4 digits of account number _

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.14 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$100.00** |
|---|---|---|---|

**Brynner Mesa**
**17350 74th**
**Hialeah, FL 33015**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Last 4 digits of account number _

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.15 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$31,460.49** |
|---|---|---|---|

**Cennox**
**1015 Windward Ridge Pkwy**
**Alpharetta, GA 30005**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  **ATM maintenance**

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.16 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$5,902.00** |
|---|---|---|---|

**Cesar Rodas**
**Yacyreta 112**
**Luque 2060**
**PARAGUAY**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  **Contractor developer**

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.17 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$3,000.00** |
|---|---|---|---|

**CipherTrace**
**140 Victory Lane**
**Los Gatos, CA 95030**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  **Blockchain analytics**

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.18 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | **$2,025.00** |
|---|---|---|---|

**Cision**
**130 E. Randolph St**
**Chicago, IL 60601**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  **Marketing services**

Is the claim subject to offset? ■ No  ☐ Yes

---

Debtor   **SandP Solutions LLC, dba Bitcoin of America**                    Case number (if known) _____
                  Name

| 3.19 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **Unknown** |
|------|---|---|---|

**Cole Kepro International, LLC**
**4170 Distribution Cir.**
**North Las Vegas, NV 89030-3356**

☐ Contingent
☐ Unliquidated
■ Disputed

Date(s) debt was incurred _____

Basis for the claim: _____

Last 4 digits of account number _____

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.20 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$62,548.89** |
|------|---|---|---|

**Croke Fairchild Duarte & Beres**
**180 N. LaSalle St.**
**Chicago, IL 60601**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim: **Attorneys' fees**

Last 4 digits of account number _____

Is the claim subject to offset? ☐ No ☐ Yes

---

| 3.21 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$18,291.69** |
|------|---|---|---|

**CT Corp**
**28 Liberty St.**
**New York, NY 10005**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim: **Compliance software**

Last 4 digits of account number _____

Is the claim subject to offset? ☐ No ☐ Yes

---

| 3.22 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$90.00** |
|------|---|---|---|

**David Johnston**
**1805 SHADY GLEN DR**
**ARLINGTON, TX 76015**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number _____

Is the claim subject to offset? ☐ No ☐ Yes

---

| 3.23 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$19,900.00** |
|------|---|---|---|

**Dawn Kimber**
**6945 E Main St Apt. 4379**
**Mesa, AZ 85207**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number _____

Is the claim subject to offset? ☐ No ☐ Yes

---

| 3.24 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$300.00** |
|------|---|---|---|

**Ellecia Flournoy**
**4219 GLENDA DR**
**COLLEGE PARK, GA 30337-4517**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number _____

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.25 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$20,433.92** |
|------|---|---|---|

**Enigma**
**217 Centre St.**
**New York, NY 10013**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim: **Wallet service**

Last 4 digits of account number _____

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.26** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$38,210.93**

**Epic eDiscovery Solutions**
**311 S. Wacker Dr.**
**Chicago, IL 60606**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  **eDiscovery vendor**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

**3.27** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **Unknown**

**Fab Fortunes Family Protection Tr.**
**2270 Corporate Circle**
**Suite 200**
**Henderson, NV 89074**

☐ Contingent
☑ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  **Advancement of expenses for Debtor**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

**3.28** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$55.00**

**Fabian Camacho**
**1260 US HIGHWAY 69**
**LIBERTY, MO 64068**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

**3.29** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **Unknown**

**Family Commercial Rental, LLC**
**c/o Nicole M. Kersten**
**1N141 County Farm Rd, Ste 230**
**Winfield, IL 60190-2023**

☐ Contingent
☑ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  **Rental payments due**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

**3.30** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **Unknown**

**Family Entertainment Rental, LLC**
**c/o Nicole M. Kersten**
**1N141 County Farm Rd, Ste 230**
**Winfield, IL 60190-2023**

☐ Contingent
☑ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  **Rental payments due**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

**3.31** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$39,240.00**

**Fireblocks**
**441 9th Ave**
**New York, NY 10001**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  **Wallet service**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

**3.32** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$77,522.79**

**First Citizens Bank**
**2601 4th St SW**
**Mason City, IA 50401**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  **Loan**

Last 4 digits of account number __

Is the claim subject to offset? ☑ No ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.33** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,250.00**

Frank Spallone
1348 Woodlwawn Ave.
Pittsburgh, PA 15221

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number

Is the claim subject to offset? ☐ No ☐ Yes

---

**3.34** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$1,300.00**

Fraze and Co
5320 159th St.
Oak Forest, IL 60452

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred

Basis for the claim:  **CPA firm**

Last 4 digits of account number

Is the claim subject to offset? ☐ No ☐ Yes

---

**3.35** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$500.00**

Gaston Drouin
21 12 AVE
HALIFAX, MA 02338

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number

Is the claim subject to offset? ■ No ☐ Yes

---

**3.36** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$38,210.93**

GenMega
11011 Rengency Crest Dr.
Dallas, TX 75238

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred

Basis for the claim:  **BTMs**

Last 4 digits of account number

Is the claim subject to offset? ■ No ☐ Yes

---

**3.37** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$8,179.00**

Inner Parish Security Co.
43222 Pecan Ridge Dr.
Hammond, LA 70403

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/6/2023**

Basis for the claim:  **Amored car carrier services**

Last 4 digits of account number  **4312**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.38** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$10,000.00**

Jeanine Larue
420 Eastman rd
Richmond, VA 23235

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number

Is the claim subject to offset? ■ No ☐ Yes

---

**3.39** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$10.00**

Jordan  Farmer
840 Park Meadows Ave 229
Bakersfield, CA 93308

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.40** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$350.00**

Lee Irwin Dunn
1143 BUCKINGHAM ST
WAYLAND, MI 49348

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number  _

Is the claim subject to offset? ☐ No ☐ Yes

---

**3.41** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$20.00**

Liam Zimmer
9311 51ST AVE
OAK LAWN, IL 60453

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number  _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.42** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,704.00**

Link2Write
Unknown

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  _

Basis for the claim:  **Marking data entry services**

Last 4 digits of account number  _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.43** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$40.00**

Lutsky Carly
130 OAKBEND COURT
ATHENS, GA 30606

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number  _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.44** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$6,000.00**

MasterCard
2200 Mastercard Blvd.
O Fallon, MO 63368

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  _

Basis for the claim:  **Credit card**

Last 4 digits of account number  **2200**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.45** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$48,635.00**

Metals & Services
145 N. Swift Road
Addison, IL 60101

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/3/2023

Basis for the claim:  **Invoice**

Last 4 digits of account number  _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.46** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$300.00**

Michael  Johnson
276 GLEN IRIS
ATLANTA, GA 30312

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  3/1/2023

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number  _

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) |
|---|---|---|
| | Name | |

---

**3.47**

**Nonpriority creditor's name and mailing address**

**Nalluri Venkata**
**6455 GALLERIA DR**
**WEST DES MOINES, IA 50266**

Date(s) debt was incurred __3/1/2023__

Last 4 digits of account number __

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$49.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency__

Is the claim subject to offset? ☐ No ☐ Yes

---

**3.48**

**Nonpriority creditor's name and mailing address**

**Nancy Sullivan**
**841 HASTING CT**
**NEWARK, DE 19702**

Date(s) debt was incurred __3/1/2023__

Last 4 digits of account number __

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$420.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.49**

**Nonpriority creditor's name and mailing address**

**NetSuite**
**2955 Campus Dr.**
**San Mateo, CA 94403**

Date(s) debt was incurred __

Last 4 digits of account number __

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$68,925.35**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Accounting software__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.50**

**Nonpriority creditor's name and mailing address**

**OptConnect**
**865 W. 450 North**
**Kaysville, UT 84037**

Date(s) debt was incurred __

Last 4 digits of account number __

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$22,556.32**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Wireless routers__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.51**

**Nonpriority creditor's name and mailing address**

**Parr Brown Gee & Loveless**
**101 S. 200 East**
**Salt Lake City, UT 84111**

Date(s) debt was incurred __12/11/2023__

Last 4 digits of account number __9701__

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$13,722.42**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Attorneys' fees__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.52**

**Nonpriority creditor's name and mailing address**

**PayLynx**
**33130 Magnolia Circle**
**Magnolia, TX 77354**

Date(s) debt was incurred __

Last 4 digits of account number __

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$3,500.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Compliance software__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.53**

**Nonpriority creditor's name and mailing address**

**Porcaro Stolarek Mete Partners, LLC**
**209 W. Jackson Blvd, Ste. 903**
**Chicago, IL 60606**

Date(s) debt was incurred __2/28/2023__

Last 4 digits of account number __

**As of the petition filing date, the claim is:** *Check all that apply.*                    **$945.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** __Consulting fees__

Is the claim subject to offset? ■ No ☐ Yes

---

Debtor   **SandP Solutions LLC, dba Bitcoin of America**                    Case number *(if known)* _____
_____
         Name

| 3.54 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$33,109.20** |
|---|---|---|---|

**RingCentral**
**20 Davis Dr.**
**Belmont, CA 94002**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _____

**Last 4 digits of account number** _____

**Basis for the claim:** Telecommunication services

Is the claim subject to offset? ■ No ☐ Yes

| 3.55 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$100.00** |
|---|---|---|---|

**Scott Sepulvado**
**220 MONARCH DR**
**HOUMA, LA 70364**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** 3/1/2023

**Last 4 digits of account number** _____

**Basis for the claim:** Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency

Is the claim subject to offset? ■ No ☐ Yes

| 3.56 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$848.00** |
|---|---|---|---|

**Sonny Meraban**
**1904 Ogden Ave**
**Lisle, IL 60532**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _____

**Last 4 digits of account number** _____

**Basis for the claim:** California Federal Income Tax Payments Due for 2023

Is the claim subject to offset? ■ No ☐ Yes

| 3.57 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$70,098.00** |
|---|---|---|---|

**Sonny Meraban**
**1904 Ogden Ave**
**Lisle, IL 60532**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _____

**Last 4 digits of account number** _____

**Basis for the claim:** Reimbursement claim for Ohio Federal Income Tax due

Is the claim subject to offset? ■ No ☐ Yes

| 3.58 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$28,148.00** |
|---|---|---|---|

**Sonny Meraban**
**1904 Ogden Ave**
**Lisle, IL 60532**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _____

**Last 4 digits of account number** _____

**Basis for the claim:** Reimbursement claim for Pennsylvania Federal Income Tax Due

Is the claim subject to offset? ■ No ☐ Yes

| 3.59 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$8,183,535.74** |
|---|---|---|---|

**Sonny Mereban**
**1904 Ogden Ave**
**Lisle, IL 60532**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _____

**Last 4 digits of account number** _____

**Basis for the claim:** Reimbursement claim for federal taxes due 2021-2023

Is the claim subject to offset? ■ No ☐ Yes

| 3.60 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,270.00** |
|---|---|---|---|

**Sonny Mereban**
**1904 Ogden Ave**
**Lisle, IL 60532**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _____

**Last 4 digits of account number** _____

**Basis for the claim:** Connecticut Federal Income Tax Due for 2022

Is the claim subject to offset? ■ No ☐ Yes

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.61** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$3,874.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Delaware Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No  ☐ Yes

---

**3.62** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$250.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  DC Federal Income Tax Payments Due for 2023

Is the claim subject to offset? ☒ No  ☐ Yes

---

**3.63** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$6,475.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Nevada Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No  ☐ Yes

---

**3.64** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$5,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Georgia Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No  ☐ Yes

---

**3.65** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$26,752.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Illinois Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No  ☐ Yes

---

**3.66** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$10,738.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Indiana Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No  ☐ Yes

---

**3.67** | **Nonpriority creditor's name and mailing address**
Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$157.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Iowa Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No  ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

| 3.68 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $25.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Mississippi Federal Income Tax Payments Due for 2023**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| 3.69 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $100.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Tennessee Federal Income Tax Due for 2023**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| 3.70 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $8,357.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Missouri Federal Income Tax Due for 2022**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| 3.71 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $175.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Kentucky Federal Income Tax Payments Due for 2023**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| 3.72 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $6,729.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Louisiana Federal Income Tax Due for 2022**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| 3.73 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $16,726.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Massachussetts Federal Income Tax Due for 2022**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| 3.74 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $708.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

Date(s) debt was incurred
Last 4 digits of account number

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Minnesota Federal Income Tax Payments Due for 2023**

Is the claim subject to offset?  ■ No  ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| 3.75 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $200.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  North Carolina Federal Income Tax Due for 2023

Is the claim subject to offset? ☒ No ☐ Yes

| 3.76 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $150.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Oregon Federal Income Tax Due for 2023

Is the claim subject to offset? ☒ No ☐ Yes

| 3.77 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $25.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  South Carolina Federal Income Tax Due for 2023

Is the claim subject to offset? ☒ No ☐ Yes

| 3.78 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $22,708.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Texas Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No ☐ Yes

| 3.79 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $12,637.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Virginia Federal Income Tax Due for 2022

Is the claim subject to offset? ☒ No ☐ Yes

| 3.80 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $25.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Wisconsin Federal Income Tax Due for 2023

Is the claim subject to offset? ☒ No ☐ Yes

| 3.81 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $456.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Massachussetts Federal Income Tax Payments Due for 2023

Is the claim subject to offset? ☒ No ☐ Yes

| Debtor | **SandP Solutions LLC, dba Bitcoin of America** | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| 3.82 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$949.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** New Jersey Federal Income Tax Due for 2023 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.83 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$25,889.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** California Federal Income Tax Due for 2022 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.84 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$5,171.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** DC Federal Income Tax Due for 2022 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.85 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$5,426.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** Kentucky Federal Income Tax Due for 2022 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.86 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$22,752.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** Minnesota Federal Income Tax Due for 2022 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.87 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$660.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** Minnesota Federal Income Tax Due for 2022 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.88 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$53.00** |
|---|---|---|---|
| | **Sonny Mereban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | **Basis for the claim:** Mississippi Federal Income Tax Due for 2022 | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

| 3.89 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $585.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  New Jersey Federal Income Tax Due for 2022

Is the claim subject to offset? ☑ No ☐ Yes

---

| 3.90 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $200.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  North Carolina Federal Income Tax Due for 2022

Is the claim subject to offset? ☑ No ☐ Yes

---

| 3.91 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $150.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Oregon Federal Income Tax Due for 2022

Is the claim subject to offset? ☑ No ☐ Yes

---

| 3.92 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,007.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  South Carolina Federal Income Tax Due for 2022

Is the claim subject to offset? ☑ No ☐ Yes

---

| 3.93 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $49,082.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Tennessee Federal Income Tax Due for 2022

Is the claim subject to offset? ☑ No ☐ Yes

---

| 3.94 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $14,794.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Wisconsin Federal Income Tax Due for 2022

Is the claim subject to offset? ☑ No ☐ Yes

---

| 3.95 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $18,141.00 |
|---|---|---|---|

Sonny Mereban
1904 Ogden Ave
Lisle, IL 60532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim:  Texas Federal Income Tax Due for 2021

Is the claim subject to offset? ☑ No ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.96** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$25.00**

**Stephen Smith**
**25511 HURON ST**
**LOMA LINDA, CA 92354**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

**3.97** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$5,705,090.70**

**Taproot Acquisition Enterprises LLC**
**c/o Patzik, Frank & Samotny Ltd.**
**200 South Wacker Drive, Suite 2700**
**Chicago, IL 60606**

☐ Contingent
☐ Unliquidated
■ Disputed

Date(s) debt was incurred  __

Basis for the claim:  **Judgment creditor, as assignee from Avtech Capital, LLC**

Last 4 digits of account number __

Is the claim subject to offset? ☐ No ■ Yes

---

**3.98** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$6,803,117.75**

**Taproot Acquisition Enterprises LLC**
**c/o Patzik, Frank & Samotny Ltd.**
**200 South Wacker Drive, Suite 2700**
**Chicago, IL 60606**

☐ Contingent
☐ Unliquidated
■ Disputed

Date(s) debt was incurred  __

Basis for the claim:  **Judgment creditor, as assignee from Captech Financial, LLC**

Last 4 digits of account number __

Is the claim subject to offset? ☐ No ■ Yes

---

**3.99** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$40.00**

**Theresa Mentana**
**1348 RIDGEWOOD DR SW**
**LILBURN, GA 30047-5563**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

**3.100** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$8,903.20**

**Thomas Reuters**
**311 S. Wacker Dr.**
**Chicago, IL 60606**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  __

Basis for the claim:  **KYC Verification**

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

**3.101** | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | **$20.00**

**Timothy  Mosher**
**12490 QUIVIRA RD APT 3112**
**OVERLAND PARK, KS 66213**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred  **3/1/2023**

Basis for the claim:  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| 3.102 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $36.00 |
|---|---|---|---|

**3.102**

**Nonpriority creditor's name and mailing address**

**Tyrome Johnson**
**2619 N 18TH ST**
**PHILADELPHIA, PA 19132**

Date(s) debt was incurred  3/1/2023

Last 4 digits of account number  _

**As of the petition filing date, the claim is:** *Check all that apply.*   $36.00

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.103**

**Nonpriority creditor's name and mailing address**

**Virginia James**
**815 N 52nd St**
**Phoenix, AZ 85008**

Date(s) debt was incurred  3/1/2023

Last 4 digits of account number  _

**As of the petition filing date, the claim is:** *Check all that apply.*   $200.00

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  **Customer deposited cash into Bitcoin ATM for purchase of cryptocurrency and did not receive cryptocurrency**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.104**

**Nonpriority creditor's name and mailing address**

**WiseStamp**
**17 State St.**
**New York, NY 10004**

Date(s) debt was incurred  _

Last 4 digits of account number  _

**As of the petition filing date, the claim is:** *Check all that apply.*   $69.60

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  **Marketing services**

Is the claim subject to offset? ■ No  ☐ Yes

---

## Part 3:   List Others to Be Notified About Unsecured Claims

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

## Part 4:   Total Amounts of the Priority and Nonpriority Unsecured Claims

5.  Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. $ | 0.00 |
| 5b. Total claims from Part 2 | 5b. + $ | 21,999,778.75 |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. $ | 21,999,778.75 |

**Fill in this information to identify the case:**

Debtor name **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the: NORTHERN DISTRICT OF ILLINOIS

Case number (if known) ______________________

☐ Check if this is an amended filing

# Official Form 206G

## Schedule G: Executory Contracts and Unexpired Leases

**12/15**

**Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.**

1. **Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the debtor's other schedules. There is nothing else to report on this form.

■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| 2.1. State what the contract or lease is for and the nature of the debtor's interest<br>State the term remaining<br>List the contract number of any government contract | **Lease of real property located at 1904 Ogden Ave, Lisle, IL 60532** | **Family Commercial Rental, LLC<br>c/o Nicole M. Kersten<br>1N141 County Farm Rd, Ste 230<br>Winfield, IL 60190-2023** |
| 2.2. State what the contract or lease is for and the nature of the debtor's interest<br>State the term remaining<br>List the contract number of any government contract | **Equipment Lease Agreement with Taproot Acquisition Enterprises, LLC as Lessee dated April 1, 2023; 36 month term Through April 1, 2026** | **Taproot Acquisition Enterprises LLC<br>c/o Patzik, Frank & Samotny Ltd.<br>200 South Wacker Drive, Suite 2700<br>Chicago, IL 60606** |
| 2.3. State what the contract or lease is for and the nature of the debtor's interest<br>State the term remaining<br>List the contract number of any government contract | **Equipment Lease Agreement with Taproot Acquisition Enterprises, LLC as Lessee, dated April 7, 2023; 36 month term Through April 7, 2026** | **Taproot Acquisition Enterprises LLC<br>c/o Patzik, Frank & Samotny Ltd.<br>200 South Wacker Drive, Suite 2700<br>Chicago, IL 60606** |

**Fill in this information to identify the case:**

Debtor name __**SandP Solutions LLC, dba Bitcoin of America**__

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF ILLINOIS

Case number (if known) _____

☐ Check if this is an
amended filing

## Official Form 206H
## Schedule H: Your Codebtors                                    12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the
Additional Page to this page.

**1. Do you have any codebtors?**

■ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.
☐ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of
creditors, Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule
on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

*Column 1:* **Codebtor**                                          *Column 2:* **Creditor**

| | Name | Mailing Address | | Name | Check all schedules that apply: |
|---|---|---|---|---|---|
| 2.1 | _____ | _____ | | _____ | ☐ D ☐ E/F ☐ G |
| | | Street _____ | | | |
| | | City        State        Zip Code | | | |
| 2.2 | _____ | _____ | | _____ | ☐ D ☐ E/F ☐ G |
| | | Street _____ | | | |
| | | City        State        Zip Code | | | |
| 2.3 | _____ | _____ | | _____ | ☐ D ☐ E/F ☐ G |
| | | Street _____ | | | |
| | | City        State        Zip Code | | | |
| 2.4 | _____ | _____ | | _____ | ☐ D ☐ E/F ☐ G |
| | | Street _____ | | | |
| | | City        State        Zip Code | | | |

**Fill in this information to identify the case:**

Debtor name        **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF ILLINOIS

Case number (if known)

☐ Check if this is an amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy          04/25

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

| Part 1: | Income |
|---|---|

1. **Gross revenue from business**

   ☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|
| **For year before that:**<br>From **1/01/2023** to **12/31/2023** | ■ Operating a business<br>☐ Other _____ | **$48,232,095.00** |

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ■ None.

| | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|

| Part 2: | List Certain Transfers Made Before Filing for Bankruptcy |
|---|---|

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ■ None.

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
   List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

   ■ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|

5. **Repossessions, foreclosures, and returns**

Debtor   **SandP Solutions LLC, dba Bitcoin of America**          Case number *(if known)* _____

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☐ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|
| **Taproot Acquisition Enterprises LLC**<br>**c/o Patzik, Frank & Samotny Ltd.**<br>**200 South Wacker Drive, Suite 2700**<br>**Chicago, IL 60606** | **25 Bitcoin ATMs: Genmega UK1 (SNs: TYKA002320 and TYKA002283); Genmega UK2 (SNs: TYKV091243, TYKV000825, TYKV032611, and TYKV002105); American Kiosks One (SNs: 152096, 15195, 152055,151956,151882, 151967, 151974, 151815, 151946, 152041, 151716, 152001, 151991, 151851, 151881, 152038, 152089, 152060, 151915, 152065, 151989, 151847, 152084, 152002, and 151947); Parts (Screens 10; Bill Aceptors Yellow 8; Computer 17; Cassettes 8; Printer Paper Rolls 5; S&G Locks 10; EPP - Keypads 4; Batteries 4)** | **April 15, 2025** | **Unknown** |
| **Taproot Acquisition Enterprises LLC**<br>**c/o Patzik, Frank & Samotny Ltd.**<br>**200 South Wacker Drive, Suite 2700**<br>**Chicago, IL 60606** | **Cash held in the Debtor's IOLTA account at Baker & Hostetler, LLP, turned over pursuant to a Turnover Order entered on May 7, 2025, in the citation proceeding of Taproot Acquisition Enterprises, LLC v. SandP Solutions, LLC, case no. 2024 L 05027, pending in the Circuit Court of Cook County, Illinois.** | **May 2025** | **$2,308.75** |

6. **Setoffs**
   List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

   ■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

| **Part 3:** | **Legal Actions or Assignments** |
|---|---|

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
   List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

   ☐ None.

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | **SandP Solutions, LLC v. Jordan Mirch, et al.**<br>**2023 CH 06098, Filed June 29, 2023** | **Breach of contract, fraudulent inducement, civil conspiracy, aiding and abetting conversion of property, breach of oral contract, and conversion** | **Circuit Court of Cook County**<br>**50 W. Washington, Suite 1001**<br>**Chicago, IL 60602-1305** | ■ Pending<br>☐ On appeal<br>☐ Concluded |

Debtor   **SandP Solutions LLC, dba Bitcoin of America**                    Case number *(if known)* _____

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.2. | **Taproot Acquisition Enterprises, LLC v. SandP Solutions, LLC**<br>**230905175, Filed July 14, 2023** | **Breach of Contract** | **Third District Court, Salt Lake County**<br>**Matheson Courthouse**<br>**P.O. Box 1860**<br>**Salt Lake City, UT 84114-1860** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.3. | **Taproot Acquisition Enterprises, LLC v. Sonny Meraban, et al.**<br>**2025L008215, Filed June 27, 2025** | **Violation of the Illinois Uniform Fraudulent Transfer Act, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty of care** | **Circuit Court of Cook County**<br>**50 W. Washington, Suite 1001**<br>**Chicago, IL 60602-1305** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.4. | **Taproot Acquisition Enterprises, LLC v. SandP Solutions, LLC**<br>**2024L050527, Filed October 31, 2024** | **Foreign judgment citation proceeding domesticating the final judgment entered on August 12, 2024 in the Third Judicial District Court, Salt Lake County, State of Utah, Case No. 230905175** | **Circuit Court of Cook County**<br>**50 W. Washington, Suite 1001**<br>**Chicago, IL 60602-1305** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.5. | **Raphael Quitoni v. SandP Solutions, LLC and Solid Armored, Inc.**<br>**0:2024cv61675, Filed September 11, 2024** | **Personal injury. Removal of Florida 17th Judicial Circuit, state court case no. CACE-23-009724(cqs)** | **USDC, Southern District of Florida**<br>**Wilkie D. Ferguson, Jr. US Courthouse**<br>**400 North Miami Avenue**<br>**Miami, FL 33128** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.6. | **Raphael Quitoni v. SandP Solutions, LLC and Solid Armored, Inc.**<br>**CACE-23-009724(cqs), Filed Sept.11, 2024** | **Personal injury** | **17th Judicial Circuit of Florida**<br>**201 SE 6th Street**<br>**Fort Lauderdale, FL 33301** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.7. | **George Epps v. John Doe, et al.**<br>**2023-CV-00044** | **Personal injury** | **Wyandotte County District Court**<br>**710 N 7th St**<br>**Kansas City, KS 66101** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.8. | **Taproot Acquisition Enterprises, LLC v. SANDP Solutions, LLC, dba Bitcoin of America**<br>**250900094, Filed January 7, 2025** | **Breach of Contract** | **Third District Court, Salt Lake County**<br>**Matheson Courthouse**<br>**P.O. Box 1860**<br>**Salt Lake City, UT 84114-1860** | ☐ Pending<br>☐ On appeal<br>■ Concluded |

Debtor    **SandP Solutions LLC, dba Bitcoin of America**    Case number *(if known)* _____

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.9. **Taproot Acquisition Enterprises, LLC v. Sonny Meraban, SandP Solutions, LLC, Fab Fortunes Family Protection Trust, et al. 2025-014394-CA-01, Filed July 28, 2025** | **Fraudulent transfers** | **Miami-Dade County Circuit Court 73 W. Flagler Street Miami, FL 33130** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.10. **Taproot Acquisition Enterprises, LLC v. SandP Solutions, LLC 2025-CA0002303-O, Filed March 18, 2025** | **Foreign judgment** | **Orange County Circuit Court 425 N. Orange Ave Orlando, FL 32801** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.11. **Genesis Coin, Inc. v. AML Software, Inc., Sonny Meraban, Ryan Pineo, S and P Solutions, LLC, Silverlogic LLC 1:24-cv-20392-JEM, Filed Jan. 31, 2024** | **Copyright infringement** | **USDC, Southern District of Florida Wilkie D. Ferguson, Jr. US Courthouse 400 North Miami Avenue Miami, FL 33128** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.12. **Raphael Quitoni v. Solid Armroed Inc. dba Solid Armored Inc., LLC, SandP Solutions, LLC 1:24cv23503, Filed Sept. 11, 2024** | **Personal injury** | **USDC, Southern District of Florida Wilkie D. Ferguson, Jr. US Courthouse 400 North Miami Avenue Miami, FL 33128** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| 7.13. **Pennsylvania Dept. of Revenue v. SandP Solutions, LLC 2024-06147** | **Certified copy of liens** | **Cumberland County Court of Common Pleas 1 Courthouse Square Room 205 Carlisle, PA 17013** | ☐ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.14. **AML Software, Inc., Sonny Meraban, and SandP Solutions, LLC v. Adducci Vega Financial Group PLLC and The Gordon Law Group, Ltd. 2024-L-000516, Filed January 12, 2024** | **Professional malpractice** | **Circuit Court of Cook County 50 W. Washington, Suite 1001 Chicago, IL 60602-1305** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.15. **Taproot Acquisition Enterprises, LLC v. SandP Solutions, LLC, Sonny Meraban, Veronica Mehraban 2023-CH-08050, Filed September 8, 2023** | **Breach of Contract** | **Circuit Court of Cook County 50 W. Washington, Suite 1001 Chicago, IL 60602-1305** | ☐ Pending<br>☐ On appeal<br>■ Concluded |

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

■ None

**Part 4:**    **Certain Gifts and Charitable Contributions**

9. **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

Debtor  __SandP Solutions LLC, dba Bitcoin of America__  Case number *(if known)* _____

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

## Part 5: Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

■ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Dates of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property)*. | | |

## Part 6: Certain Payments or Transfers

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| | Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | **Buchalter, A Professional Corp**<br>**180 North LaSalle Street**<br>**Suite 3300**<br>**Chicago, IL 60601-2808** | **Attorneys' Fees** | **July 16, 23, 2025** | **$50,000.00** |
| | Email or website address<br>**buchalter.com** | | | |
| | Who made the payment, if not debtor?<br>**FAB Fortunes Family Protection Trust, sole member and owner of Debtor** | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

■ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

**13. Transfers not already listed on this statement**

List any transfers of money or other property - by sale, trade, or any other means - made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☐ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

Debtor   **SandP Solutions LLC, dba Bitcoin of America**                                    Case number *(if known)* _____

| | Who received transfer?<br>Address | Description of property transferred or<br>payments received or debts paid in exchange | Date transfer<br>was made | Total amount or<br>value |
|---|---|---|---|---|
| 13.1<br>. | **Cryptobase LLC<br>44000 N Federal Hwy, Ste. 206<br>Attn: Michael Telvi<br>Boca Raton, FL 33431** | **Sale of 50 Genmega UK1 and UK2 Bitcoin<br>ATMs** | **December 10,<br>2024** | **$95,000.00** |
| | **Relationship to debtor<br>None** | | | |

---

**Part 7:   Previous Locations**

14. **Previous addresses**
    List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy<br>From-To |
|---|---|

**Part 8:   Health Care Bankruptcies**

15. **Health Care bankruptcies**
    Is the debtor primarily engaged in offering services and facilities for:
    - diagnosing or treating injury, deformity, or disease, or
    - providing any surgical, psychiatric, drug treatment, or obstetric care?

    ■ No. Go to Part 9.
    ☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services<br>the debtor provides | If debtor provides meals<br>and housing, number of<br>patients in debtor's care |
|---|---|---|

**Part 9:   Personally Identifiable Information**

16. **Does the debtor collect and retain personally identifiable information of customers?**

    ☐ No.
    ■ Yes. State the nature of the information collected and retained.

       **Driver's license information**
       Does the debtor have a privacy policy about that information?
       ☐ No
       ■ Yes

17. **Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or
    profit-sharing plan made available by the debtor as an employee benefit?**

    ☐ No. Go to Part 10.
    ■ Yes. Does the debtor serve as plan administrator?

       ☐ No Go to Part 10.
       ■ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| **Bitcoin of America 401(k) Plan** | EIN:  **47-4520650** |

       Has the plan been terminated?
       ☐ No
       ■ Yes

| Debtor | **SandP Solutions LLC, dba Bitcoin of America** | Case number *(if known)* | _____ |
|---|---|---|---|

---

**Part 10:**  **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

■ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

■ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Does debtor still have it? |
|---|---|---|---|

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

■ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|

---

**Part 11:**  **Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

■ None

---

**Part 12:**  **Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22.  Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

■ No.
☐ Yes. Provide details below.

| Case title Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an**

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number *(if known)* | |

environmental law?

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**Part 13:    Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case.
Include this information even if already listed in the Schedules.

■ None

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|

**26. Books, records, and financial statements**
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
☐ None

| Name and address | | Date of service<br>From-To |
|---|---|---|
| 26a.1. | Picker & Associates LLC<br>750 W. Lake Cook Road, Suite 375<br>Buffalo Grove, IL 60089 | 2022-present |
| 26a.2. | Tracy Schofield<br>6423 W. Home Ave, Apt. 15<br>Worth, IL 60482 | Through 4th quarter 2023 |
| 26a.3. | Ana Lopez<br>6510 Benich LN<br>Plainfield, IL 60586 | Through 4th quarter 2023 |
| 26a.4. | Jennifer Cruz<br>6222 S Kolin Ave<br>Chicago, IL 60629 | Through 4th quarter 2023 |
| 26a.5. | Veronica Mehraban<br>1904 Ogden Ave<br>Lisle, IL 60532 | 2022-present |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

■ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Debtor | SandP Solutions LLC, dba Bitcoin of America | Case number *(if known)* |
|---|---|---|

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1.  **Veronica Mehraban**<br>**1904 Ogden Ave**<br>**Lisle, IL 60532** | |
| 26c.2.  **Picker & Associates LLC**<br>**750 W. Lake Cook Road, Suite 375**<br>**Buffalo Grove, IL 60089** | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

■ None

| Name and address |
|---|

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

■ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Fab Fortunes Family Protection Trust** | **2270 Corporate Circle, Suite 200 Henderson, NV 89074** | **Member** | **100%** |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Sonny Meraban** | **1904 Ogden Ave Lisle, IL 60532** | **Manager** | **0%** |

**29.** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

☐ No

■ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| **William P. Suriano** | **420 Scott St. Crown Point, IN 46307-4929** | **Manager; 0%** | **2022- August 4, 2025** |

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| **Reza Mehraban** | **1904 Ogden Ave Lisle, IL 60532** | **Manager; 0%** | **2022- August 4, 2025** |

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

Debtor    **SandP Solutions LLC, dba Bitcoin of America**                          Case number *(if known)*

☐ No
■ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1 **Fab Fortunes Family Protection Tr.** **2270 Corporate Circle** **Suite 200** **Henderson, NV 89074** | **$95,000.00** | **December 10, 2024** | **Advancement for corporate related expenses of Debtor** |
| **Relationship to debtor** **Sole owner** | | | |

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

■ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

■ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|

Fill in this information to identify the case:

Debtor name    **SandP Solutions LLC, dba Bitcoin of America**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF ILLINOIS

Case number (if known)

☐ Check if this is an amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                                04/25

**The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).**

### Part 14:    Signature and Declaration

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 5, 2025**

**/s/ Sonny Meraban**                                   **Sonny Meraban**
Signature of individual signing on behalf of the debtor       Printed name
                                                          •

Position or relationship to debtor    **Manager**

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**
■ No
☐ Yes

Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Northern District of Illinois

In re    **SandP Solutions LLC, dba Bitcoin of America**

Debtor(s)

Case No. _____

Chapter    **7**

# DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1.  Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

|  |  |  |
|---|---|---|
| For legal services, I have agreed to accept | $ | 50,000.00 |
| Prior to the filing of this statement I have received | $ | 50,000.00 |
| Balance Due | $ | 0.00 |

2.  $ **0.00** of the filing fee has been paid.

3.  The source of the compensation paid to me was:

    ☐ Debtor    ■ Other (specify):    **Fab Fortunes Family Protection Trust, sole member of Debtor**

4.  The source of compensation to be paid to me is:

    ■ Debtor    ☐ Other (specify):

5.  ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

    ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm.  A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

6.  In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

    a.  Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
    b.  Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
    c.  Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
    d.  [Other provisions as needed]

7.  By agreement with the debtor(s), the above-disclosed fee does not include the following service:
    **Representation of the debtor or any of its affiliates in any adversary proceeding or contested motion brought by the chapter 7 trustee or any other person or entity in the chapter 7 bankruptcy case.**

---

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

**August  5, 2025**

*Date*

/s/ Steve Jakubowski

**Steve Jakubowski (ARDC #6191960)**

*Signature of Attorney*

**Buchalter, A Professional Corp
180 North LaSalle Street
Suite 3300
Chicago, IL 60601-2808
312-456-0191  Fax: 312-782-6690
sjakubowski@buchalter.com**

*Name of law firm*

# Buchalter

180 N. LaSalle
Suite 3300
Chicago, IL 60601
312.456.0191 Phone
sjakubowski@buchalter.com

July 10, 2025

Mr. Sonny Meraban
SANDP Solutions LLC
833 W. Chicago Ave, Suite 203
Chicago, Illinois 60642

    Re: Agreement for Legal Services

Dear Sonny:

This engagement letter agreement, which includes the attached and incorporated Terms and Conditions (this "Agreement" or "Engagement Letter"), confirms that you have requested that, effective as of July 8, 2025, Buchalter, A Professional Corporation (the "Firm"), be retained to represent the SANDP Solutions LLC (the "Client") in connection with a potential chapter 7 bankruptcy filing in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. This representation will include representation of the Client as "debtor" in the chapter 7 bankruptcy case, including: attendance with the Client at the any "Meeting of Creditors" scheduled under section 341 of the United States Bankruptcy Code, 11 U.S.C. § 341; interviews by and communications with or initiated by the chapter 7 trustee appointed in the case and the Office of the United States Trustee; and production of documents to the chapter 7 trustee. Unless a separate written engagement agreement is executed by the Firm, however, this engagement will not include representation of the Client or any of its affiliates in any adversary proceeding or contested motion brought by the chapter 7 trustee or any other person or entity in the chapter 7 bankruptcy case or any pending or prospective state court action.

This Agreement will apply not only to the present matter, but also to any future matters in which the Firm expressly agrees and has the ethical ability to represent Client and/or affiliates unless superseded by another written agreement. This Agreement contains the mutual understanding between Client and the Firm with respect to services the Firm will perform and payment for those services. **Please make special note of the Dispute Resolution provisions of the attached Terms and Conditions, which provide that any and all disputes between Client and the Firm will be resolved by contractual arbitration.**

buchalter.com
Arizona
California
Colorado
Georgia
Oregon
Tennessee
Utah
Washington

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 2

By signing this Agreement, Client is agreeing to each of the terms of this Agreement, which means that it has either consulted independent counsel about this Agreement or has chosen not to do so.

If this Agreement accurately reflects the agreed terms, please sign a copy of this Agreement on the next page and return it to the Firm with the security payment retainer. This Agreement will take effect when the Firm receives the signed Agreement and the security payment retainer. The Firm will have no obligation to provide legal services until this Agreement takes effect.

The Firm appreciates your confidence and looks forward to a long and successful relationship.

Very truly yours,

BUCHALTER
A Professional Corporation

*Steve Jakubowski*

Steve Jakubowski

## CLIENT ACKNOWLEDGEMENT

The undersigned has read and understands the terms of this Agreement, including the attached Terms and Conditions (including the disclosures and consents to the Dispute Resolution provisions), and agrees to all of them.

SANDP SOLUTIONS, LLC

By:_____

Name: Sonny Meraban
Title: Authorized Agent

# Buchalter

SANDP Solutions. LLC
July 10, 2025
Page 3

## **PERSONAL GUARANTY**

In order to induce the Firm to become engaged by SANDP Solutions. LLC  (the "Client") on the terms of this Engagement Letter, and for other good and valuable consideration, I, Sonny Meraban ("Guarantor"). hereby unconditionally, absolutely, continuingly, and irrevocably personally guaranty all obligations of the Client (i) to fund the $50,000 advance payment retainer in advance of the filing of the chapter 7 petition and (ii) all other obligations arising under this Engagement Letter in excess of the $50,000 advance payment retainer up to a cap of $25,000.00 (collectively, the "Guaranteed Amount"). This guaranty is a primary guaranty and not a guaranty of collection.

By: _____

Name:  Sonny Meraban

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 4

## **Terms and Conditions of Representation**

1.     <u>Terms and Conditions Incorporated</u>. These Terms and Conditions are incorporated into the preceding letter and together they constitute the agreement between Client and the Firm.

2.     <u>The Firm's Duties and Client's Duties</u>. The Firm's responsibilities will be to provide legal counsel and assistance and represent Client's interests within the bounds of the law and the ethical requirements of the legal profession. The Firm will endeavor to keep Client informed of the progress of the matter or matters the Firm is handling for Client and respond to Client's inquiries. For Client's part, Client agrees to provide the Firm with truthful and accurate information, to cooperate and keep the Firm informed of any developments that may affect its handling of Client's matter or matters, and to pay Firm invoices on a timely basis. In addition, Client will be responsible for advising the Firm whether any document the Firm has prepared or received and sent to Client for Client's approval or review reflects the principal terms of Client's proposed agreement, general strategy or other expectations, as the case may be. We both agree to abide by the terms of this Agreement.

3.     <u>Legal Fees and Billing Practices</u>. The Firm's professional fees reflect a number of factors, including the number of attorney hours incurred, the relative experience of the attorneys performing the services, the difficulty of the matter, and the results obtained for the Firm's client. The Firm's professional fees are usually determined by the number of hours expended, multiplied by the professional's hourly billing rate. The Firm's minimum billing unit for its legal personnel is one-tenth of an hour.

The Firm anticipates the following persons at the Firm will be primarily assigned to this engagement at the following hourly billing rates:

| | |
|---|---|
| Steven Jakubowski (IL) | $750 per hour |
| Patricia Jolley (Senior Paralegal) | $325 per hour |

The Firm reserves the right to change or add to the attorneys performing services under this Agreement as appropriate, with hourly rates consistent with those above.

From time to time, the Firm's hourly billing rates will change, as will other costs related to the services that the Firm will perform. In the event of a change in these rates, they will be reflected in Client's next bill. If Client has any concerns about any change in billing rate, please promptly discuss them with the attorney primarily responsible for Client's matter.

The Firm will charge for all activities undertaken in providing legal services to Client, including, but not limited to, the following: conferences and meetings, including preparation and participation; preparation and review of correspondence and other documents; legal research, including computerized research; court and other appearances, including preparation; and necessary travel; evidence preparation, including electronic document management; audit response letters; and telephone calls, including calls with Client and other attorneys or persons

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 5

involved with Client's matter. The legal personnel assigned to Client's matters may need to confer among themselves about the matters. When they do need to confer, each person may charge for the time expended. Similarly, if more than one of the Firm's legal personnel attends a meeting, court hearing or other proceeding, each may charge for the time spent, although the Firm will always attempt to be judicious in the number of persons it sends. When Firm personnel travel for Client's matters, the Firm charges for travel time, portal to portal, both local and out of town.

Upon cessation of the Firm's active involvement in a particular matter for which the Firm has been engaged, the Firm will have no further duty to inform Client of future developments or changes in the law as may be relevant to such matter or matters in which the Firm's representation has ceased.

    4.    <u>Costs and Other Charges for Which the Firm Will Bill Client.</u>

    (a)    The Firm may incur various costs and expenses in the normal course of performing legal services under this Agreement (excluding routine photocopying, faxes, long distance phone calls, or routine postage). The Firm's preference is for Client to advance all expenses. In circumstances where it is not practical for Client to advance costs, Client agrees to reimburse the Firm for those costs and expenses in addition to the fees the Firm incurs working on Client's matter.

    (b)    Costs and expenses for which the Firm charges include filing and recordation fees, court reporters' fees, messenger and other delivery fees, parking, transportation, lodging, and other necessary travel expenses, non-routine photocopying and scanning (wherever performed), bulk postage, and other similar items. Costs and expenses could also include expert witness fees, title insurance fees, consultant and investigator fees, and similar out-of-pocket expenses incurred on Client's behalf.

    (c)    If the Firm's engagement ultimately leads to significant litigation or other matters involving electronic discovery, the Firm will use a third party electronic discovery platform provider ("E-Discovery Platform") to process, host, assess and store electronic data for the matters. The E- Discovery Platform will charge fees for these services and Client will be responsible for payment of all such fees owed to the E-Discovery Platform. Unless a different arrangement is reached, the Firm will include these fees in the invoices issued to Client. The rates charged by the E-Discovery Platform will be made available at any time upon Client's request.

    (d)    The Firm will charge all costs and expenses at the Firm's actual cost when payable or reimbursable to a third party.

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 6

    5.    Services the Firm Does Not Undertake, Unless Expressly Agreed in Writing.

    (a)    Insurance Advice. Although the Firm does not and cannot express any opinion on the subject, Client may be a beneficiary under a policy or policies of insurance that could provide a defense or otherwise indemnify Client from any liability to other parties or for damages that Client may have suffered that are related to the matter or matters upon which Client employs the Firm. The Firm recommends that Client consult with Client's insurance professionals as to whether such insurance coverage exists. **Representation of Client with respect to any insurance issue, including whether Client has insurance that might provide coverage, is not within the scope of the Firm's duties unless expressly provided for in this Agreement.**

    (b)    Post-Judgment Obligations. If the Firm's services involve obtaining a judgment or defending against a judgment and a judgment is obtained, the Firm will only be responsible for those post-judgment activities Client expressly requests in writing that the Firm undertake and that the Firm agrees in writing to undertake, for which Client will be obligated to compensate the Firm under the terms of this Agreement. This includes any post-judgment motions, appeals, abstracts, judgment liens, and renewals of judgments.

    (c)    Post-Closing Matters. Unless Client requests in writing to the contrary, the Firm will have no obligation to monitor renewal, notice, annual maintenance, perfection expiration dates, post-closing deadlines related to contingent consideration, working capital or indemnification obligations, or other or similar deadlines that may arise from the matters for which Client has retained the Firm.

    (d)    Future Developments or Changes in the Law. Upon cessation of the Firm's active involvement in a particular matter for which the Firm has been engaged, the Firm will have no further duty to inform Client of future developments or changes in the law as may be relevant to such matter or matters in which the Firm's representation has ceased.

    (e)    Corporate Transparency Act Updates. The Firm will not monitor the need to, nor file any amendments to a beneficial ownership information filing unless it specifically agrees to do so after being expressly requested to do so by Client at the time such amendment is required by applicable law or regulation.

    6.    Advance Payment Retainer. The Firm will require a $50,000 retainer deposit to open this matter and comment the representation, with $25,000 to be paid upon execution of the retainer agreement and the remainder to be paid prior to the filing of the chapter 7 petition. This $50,000 retainer shall be in the form of an "advance payment retainer." This payment will be treated as an absolute transfer to the Firm, is income to the Firm upon receipt, and will not be held in a client trust account but will be deposited into the Firm's regular operating account. However, in the event our attorney/client relationship is terminated, a right of refund will then arise which will entitle the Client's chapter 7 estate to a refund of the payment to the extent it is not earned by the Firm on account of services rendered at our stipulated hourly rates or required for expenses we incur.

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 7

Under Illinois law, in addition to the traditional retainer paid to attorneys (often referred to as a "security retainer"), the retainer is held by the attorney in a separate trust account and remains the property of the Client until the attorney applies it to charges for services that are actually rendered. Under Illinois law, while the Client has the option to treat the $50,000 advance payment required hereunder as a "security retainer," the Firm is unwilling to represent the Company unless the payment is treated as an "advance payment retainer." One of the reasons that the Firm is requiring that this payment be treated as an "advance payment retainer" rather than as a "security retainer" is that, under Illinois law and in applicable circumstances, a "security retainer" may remain subject to the claims of creditors while an "advance payment retainer" cannot be reached by creditors. Accordingly, treating the $50,000 advance payment as an "advance payment retainer" will afford both the Client and the Firm with greater assurance that the Firm will be compensated and that the Client will have legal services to the extent of the payment, subject to the terms of this letter. Accordingly, by executing this letter, the Company agrees that the $50,000 advance payment shall be treated as an "advance payment retainer," as described above, and not as a "security retainer".

7.      Billing Statements. Unless otherwise agreed, the Firm will send Client monthly statements indicating fees and costs incurred, any amounts applied from any security deposit retainer, and any current balance owed. If there are minimal or no fees or costs for a particular month, the Firm may hold a statement and combine it with that for subsequent months. Each statement is due upon receipt, but in any event no later than thirty calendar days after the Firm transmits it to Client. If Client has any questions concerning any billing statement, please discuss them with the lawyers handling Client's matter immediately so that the Firm has an opportunity to promptly resolve any issues that Client may have.

In the event of a billing dispute, Client agrees to pay all uncontested amounts within thirty calendar days of the invoice date. In the Firm's discretion, a late charge of the lesser of 10% per annum shall accrue and be payable on all amounts not paid within thirty days from the date. The Firm's failure to reflect such accrual on any statement received by the Firm to Client shall not be deemed a waiver thereof. The Firm also reserves the right to suspend further work at any time that there is an outstanding statement more than thirty calendar days past due. If Client does not pay an outstanding invoice in accordance with this Agreement, subject to the rules of the tribunal, Client expressly consents to the Firm's withdrawal as attorney(s) of record in any legal action in which the Firm has appeared on Client's behalf.

8.      Estimate. It is often difficult to predict with any certainty the actual amount of legal fees, costs, or time that will be incurred with respect to any particular task or matter. However, upon request, the Firm will provide Client with estimates of legal fees, costs, and/or time to complete a task or matter, **but any such figure will be an estimate only and not a guarantee that the actual fees, costs or time will be in the amount of, or limited to, the estimate**. If the Firm gives Client an estimate of fees, costs or time for a particular task or matter, Client will be responsible for the Firm's actual legal fees and costs, regardless of whether they are greater or less than the estimate.

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 8

9. Disclaimer of Guarantee. Nothing in this Agreement should be construed as a promise or guarantee about the outcome of any matter that the Firm is handling on Client's behalf. The Firm's comments about the outcome of Client's matter, estimated times to conclude the handling of Client's matter, and the associated fees and costs, are expressions of opinion only.

10. Discharge, Withdrawal and Termination.

(a) Client may discharge the Firm at any time and the Firm has the right to withdraw from representing Client at any time, subject to any required court approvals and consistent with the rules of professional conduct. Reasons for the Firm's withdrawal include, but are not limited to, Client's breach of this Agreement, Client's failure to pay the Firm's invoices when due, Client's refusal to cooperate with the Firm or to follow its advice on a material matter, or any fact or circumstance that would render the Firm's continuing representation of Client unlawful or unethical.

(b) The Firm's representation of Client as a current client will be terminated immediately upon completion of its services in the last pending matter. Any representation requested by Client and agreed to by the Firm following the conclusion of the Firm's services in any previously pending matter will constitute a new engagement but will still be governed by this Agreement.

(c) When the Firm's services conclude, all unpaid amounts will immediately become due and payable. After the Firm's services conclude, upon Client's written request, the Firm will deliver Client's files to Client along with any funds or property of Client's in the Firm's possession after applying any unused security payment retainer to any balance on Client's account. The work product produced in the course of the Firm's representation is and will remain Firm property.

11. Conflicts with Other Clients. The Firm's undertaking to represent Client will not act as a bar to prevent the Firm from representing any existing or future client with respect to a claim adverse to Client, provided that the Firm is no longer representing Client as a current client and, in the course of the Firm's representation of Client, the Firm has not obtained confidential information from Client that is material to the representation of the other client. In addition, the Firm's representation of Client in the matter or matters in which the Firm is employed shall not preclude the Firm from concurrently representing other clients also adverse to those same parties, provided that Client's confidentiality and privileges are preserved.

12. Dispute Resolution. The Firm is confident that any dispute or disagreement that may arise out of or relate to its legal services, including the fees charged, can be resolved to the mutual satisfaction of all parties through discussion or mediation.

(a) Arbitration of Disputes. If the Firm and Client cannot amicably and mutually resolve any disputes between them, the Firm and Client agree that all disputes arising out of or relating in any way to this Agreement, the relationship between Firm and Client, or the services performed or the attorneys' fees and costs charged (including, but not limited to, claims

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 9

based on alleged professional malpractice, negligence, errors or omissions, breach of contract, breach of fiduciary duty, fraud, or any claim based upon tort or any statute), shall be submitted, as soon as practicable, to final and binding arbitration in Chicago, Illinois before JAMS, a private mediation and arbitration tribunal, pursuant to its Arbitration Rules and Procedures ("JAMS Rules"), before a single neutral arbitrator who is a retired judge or justice to be mutually agreed upon by Firm and Client. If no agreement on the arbitrator can be reached within fifteen days after initiation of the arbitration, then the arbitrator will be selected in accordance with the JAMS Rules. Any decision of the arbitrator may be confirmed in a court of competent jurisdiction and the ensuing judgment may thereafter be enforced in the same manner as a judgment in a civil action.

(b)     Arbitration Confidentiality. The arbitration proceedings and award shall be kept strictly confidential between the Firm and Client, and except for each parties' representatives on a need to know basis, will not be disclosed to any other person or entity, unless disclosure is necessary for the preparation and conduct a hearing on the merits, or in a judicially filed application for a preliminary injunction, or in any confirmation hearing of or motion to vacate the arbitrator's award in a court of competent jurisdiction, or in proceedings to enforce a judgment based upon the confirmed award.

(c)     Advantages and Disadvantages of Arbitration. By agreeing to arbitrate any disputes, Client is giving up Client's right to have such disputes heard and determined by a non-retired judge or by a jury in a court of law. The benefits of arbitration is that is often quicker and more efficient and presided over by persons with more knowledge of the substantive issues. It is also generally more expensive, appeals from arbitration awards are more limited than appeals from court judgments, and discovery is generally less broad than permitted in a court of law. **Should Client have any questions about the significance of Client's agreement to arbitrate as set forth in this Agreement, Client should consult with an attorney who is independent of the Firm.**

(d)     Arbitration Jurisdiction. The arbitration will be controlled by the provisions of the Federal Arbitration Act (9 U.S.C. § 1 *et. seq.*) except that Illinois substantive law shall be applied to resolve the underlying disputes to be arbitrated. The Firm and Client agree that it is the arbitrator, and not any federal or state court, who has the exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this agreement to arbitrate, including, but not limited to, determining which claims are subject to arbitration, or any claim that all or any part of this agreement to arbitrate is unenforceable, voidable, or void.

13.     Illinois Law Applies. Any legal action, arbitration or proceeding concerning or in any way relating to the terms and provisions of this Agreement or the Firm's representation of Client shall be brought in Illinois and Illinois's substantive laws shall apply.

14.     Arbitration Provisions Binding. The person signing this Agreement, as the organizer and on behalf of Client, agrees that she will be bound by the "Arbitration of Disputes" provisions of this Agreement, set forth above. **The Firm encourages all persons signing this Agreement to consult with independent counsel about this provision.**

# Buchalter

SANDP Solutions, LLC
July 10, 2025
Page 10

     15.    File Maintenance. The Firm will maintain Client's files and documents in a particular matter while it is actively handling that matter and for a reasonable time thereafter. The Firm will have the right to destroy Client's files after a reasonable time as the Firm deems appropriate given the circumstances, without any obligation to notify Client. Of course, Client may request Client's files or documents at any time prior to such destruction, and they will be promptly returned to Client or to others as directed.

     16.    Entire Agreement. Except for any consents to a conflict of interest provided separately, this Agreement contains all of the terms of the agreement between the Firm and Client applicable to the Firm's representation of Client. This Agreement may only be modified by a subsequent written agreement of the parties.

## United States Bankruptcy Court
### Northern District of Illinois

In re   **SandP Solutions LLC, dba Bitcoin of America**

Debtor(s)

Case No.

Chapter   **7**

## VERIFICATION OF CREDITOR MATRIX

Number of Creditors:                    **68**

The above-named Debtor(s) hereby verifies that the list of creditors is true and correct to the best of my (our) knowledge.

Date:   **August 5, 2025**

**/s/ Sonny Meraban**
**Sonny Meraban/Manager**
Signer/Title